## TIMKEN ROLLER BEARING CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10326.

Circuit Court of Appeals, Sixth Circuit.
May 26, 1947.

John G. Ketterer, of Canton, Ohio (Day, Cope, Ketterer, Raley & Wright, John G. Ketterer, and D. W. Raley, all of Canton, Ohio, on the brief), for petitioner.

John Hull, of Washington, D. C. (Gerhard P. Van Arkel, Morris P. Glushien, A. Norman Somers, Marcel Mallet-Prevost, and Margaret M. Farmer, all of Washington, D. C., on the brief), for respondent.

Before SIMONS, ALLEN, and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

This is not the usual Labor Board case. There is no dispute as to primary facts and the controversy revolves mainly about the interpretation and legal effect of a collective bargaining agreement containing a no-strike clause and detailed procedures for adjustment of grievances. The Labor Board issued its cease and desist order commanding the petitioner to refrain from unfair labor practices in refusing to bargain with United Steel Workers of America (CIO). The petitioner seeks to have the order set aside, and the Labor Board responds with a petition for its enforcement.

The petitioner is an Ohio corporation engaged in the manufacture of bearings, steel tubing and rock bits, with its main plant at Canton, Ohio, and subsidiary plants at Gambrinus, Wooster, Mt. Vernon and Columbus. Since 1937 it has had contracts with the Union concluded as the result of collective bargaining covering wages, hours of work and other terms and conditions of employment. The contract here involved was entered into on February 19, 1943, with the United Steel Workers of America on behalf of all production and maintenance employees in the company's bearing, steel and tube plants in Canton and Gambrinus, and its bearing plants at Columbus. It recognized the union as the exclusive representative of such employees, provided that either party might initiate a conference for the purpose of negotiating changes in its terms and conditions, and that upon failure to agree upon such proposed changes, it could be terminated upon 20 days' notice. The "No Strike Clause" is as follows:

"It is agreed between the parties hereto that the procedure provided in this contract is adequate, if followed in good faith by both parties, for a fair and expeditious settlement of any grievance arising between the parties. There shall be no lock-outs on the part of the Company and no strikes on the part of the Union during the term of this agreement, * * * The parties hereto agree to cooperate in disciplining any employee or employees who cause a stoppage during the term of this contract."

The contract also contained a section devoted to "Adjustment of Grievances," which set up detailed procedures for such adjustments in four steps, but providing that grievances of a general nature which cannot be handled under the first three, may be discussed at any step four meeting of the grievance committee, and providing further that any grievance or dispute involving the interpretation or application of the contract not thereby adjusted should be submitted to arbitration.

The grievance section of the contract also contained the following clause:

"Should differences arise between the Company and the Union as to the meaning and application of the provisions of this agreement or should any local trouble of any kind arise in the plant, there shall be no suspension of work on account of such differences, but an earnest effort shall be made to settle such differences promptly in the manner hereinafter outlined."

There was in addition the so-called "Management Clause," which is as follows:

"The management of the works and the direction of the working forces, including the right to hire, suspend or discharge for proper cause, or transfer, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Company, provided that this will not be used for purposes of discrimination against any member of the Union."

On October 15, 1945, the union inaugurated a general strike in the Canton and Gambrinus plants of the company. Its immediate causes were the disciplinary action taken against employees of the 10" mill who had left their jobs because of a shortage in the work-crew, and certain work schedules placed in effect for maintenance employees of the Canton plant. Upon the calling of the strike the company stopped bargaining on two grievances then in process under the contract, and refused to participate in any grievance proceedings relating to the cause of the strike until the men returned to work. In respect to such causes no grievances had been initiated by the union prior to the strike. Several days after the walk-out the union demanded, in writing, a meeting between representatives of the company and its grievance committee. To this demand the company replied that the strike was a breach of the union's contract but that the company would meet with the grievance committee and representatives of the union under the grievance procedure of the contract, after the union had permitted employees to return to work and called off the strike, and after grievances had been filed in respect of any matter concerning which any employees have a complaint. On November 4, 1945, while the strike was still in progress, the company suggested that it was willing to modify the grievance procedure (as permitted by the contract), waiving steps 1 and 2, and to proceed with grievances as to the alleged causes of the strike in combined steps 3 and 4 of the grievance procedure, and that if any such grievances were not adjusted in such meetings the union might, of course, resort to arbitration in accordance with the terms of the contract. No reply was received to this offer although the union called off the strike on November 16 and the employees returned to work on November 19, on which date grievances were filed and handled in accordance with the company's suggestion.

On November 13, 1945, hearings began before the regional examiner of the Labor Board upon its complaint that the company had indulged in unfair labor practices by refusing to bargain. When the strike was terminated on November 16, while the hearing was still in progress, the company suggested to the union that processing of grievances be postponed to a mutually convenient time after the conclusion of the hearing, because its representatives were required to be present there, but should its suggestion on this matter not be in accord with the wishes of the union the company would consider any suggestions that it might offer. To this there was no reply.

Prior to this, on October 11, 1945, the union had demanded that it be consulted on the subject of the subcontracting of work on the part of the company. The company replied that the matter of subcontracting was a management function over which the union had no jurisdiction, and that the union had for a long time recognized that the matter of subcontracting was essentially a function of management and it had been made so by the contract. The record is without dispute that the practice of subcontracting work had been followed by the company for more than 25 years, had covered a variety of operations and types of work, had depended upon various considerations such as shortages of men, lack of equipment, lack of necessary skill on the part of employees and whether certain work could be done more expeditiously under subcontracts than by the company. The union had not before objected to this practice, although the first contract with it had been made in 1937 and similar contracts had been in existence since that date. At the time the company received the union's communication in regard to subcontracting, no grievance in respect to it was pending under the grievance procedure of the contract, although in July, 1945, a grievance had been filed, had been returned to the union for lack of definiteness and had thereafter been abandoned.

On April 22, 1946, four months before the Board's decision, a new contract was entered into by the company and the union, with substantially identical provisions and grievance procedures contained in the 1943 contract. The only substantial change was in the management clause which was made more specific, without reference, however, in any way, to the practice of subcontracting. On August 26 the Board announced its decision and issued its order. The grounds for decision were that the company had refused to bargain during the pendency of the strike concerning grievances then in process, the causes of the strike and subcontracting.

The petitioner's position is that it is not an unfair labor practice for an employer with a bargaining agreement with his employees containing a no-strike clause, and provisions for adjustment of grievances, to stand upon the terms of the bargain and demand that a strike be terminated and grievances handled within the framework of the contract, and that it is not an unfair labor practice for an employer to present his view as to the coverage of the contract in respect to subcontracts when the terms of the contract provided that differences as to the meaning and application of the provisions of the agreement should be settled in the manner therein provided. The Board's all-enveloping response to this is, as we interpret it, a contention that under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., there is a continuous statutory obligation to bargain which exists independently of all contractual obligations, and that a breach of contract on the part of the union does not relieve the employer from this obligation. As its counsel fervently urged in argument, the company must bargain and again bargain and yet again bargain without regard to breaches of contract by the union. It is this contention that we must now examine and it is not without its difficulties.

■ Our first consideration must be the status and effect of an agreement in the statutory scheme for equalizing the economic position of management and labor in bargaining as to conditions of employment. An analysis of the terms of the Act,

its declaration of policy, the reports of the committees submitting the draft to the Congress and the interpretations put upon the law by the courts, makes it abundantly clear that the bargaining duty imposed upon employers by the law had, for its end and purpose, the negotiating and concluding of a binding agreement. This must be so for it would be mere futility to bargain without such objective. So § 1 of the Act declares that one of its purposes is the negotiation of terms and conditions of employment, and the report of the House Committee (H.R. 1147, p. 20, 74th Congress, 1st Session) declares the purpose of the bill to be "to encourage collective bargaining and the making of agreements." In Consolidated Edison Co. of New York v. N.L.R.B., 305 U. S. 197, 59 S.Ct. 206, 220, 83 L.Ed. 126, the Supreme Court said, "The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining." Indeed, so important is an agreement to the bargaining process that when it is reached the Act requires a permanent memorial of its terms to avoid frustrating the bargaining process. An authentic record of its terms must be provided which could be exhibited to employees as evidence of the good faith of the employer, and so avoid fruitful sources of dissatisfaction and disagreement. H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 523, 524, 61 S.Ct. 320, 325, 85 L.Ed. 309, affirming our decision in 6 Cir., 110 F.2d 843. There the court said, " * * * the signed agreement has been regarded as the effective instrument of stabilizing labor relations and preventing, through collective bargaining, strikes, and industrial strife. * * * Congress, in thus incorporating in the new legislation the collective bargaining requirement of the earlier statutes included as a part of it, the signed agreement long recognized under the earlier acts the final step in the bargaining process."

■ This repeated asseveration of the importance of a written and signed agreement as the culminating step in the bargaining process so as to avoid industrial strife, does not contemplate and can by no process of reasoning be conceived as contemplating an unilateral undertaking by the employer

binding upon him but devoid of controls on the bargaining agent or those for whom it speaks. Certainly, it is not without its disciplines over both of the parties to it, within the reasonable scope of its terms and conditions. The observation by the Second Circuit Court of Appeals in N.L.R.B. v. Remington Rand, Inc., 94 F.2d 862, 873, "though the union may have misconducted itself, it has a locus poenitentiae," is in reference to misconduct outside the scope of an agreement and has no application to any issue here involved.

■ As we view the controversy, we have no problem in respect to the enforcement of the agreement. When employees undertake a strike in breach of a covenant not to do so, there is no power in the Labor Board nor in this court to compel them to work. We may not restrain them in the exercise of lawful activities, normally incident to the prosecution of a strike. Our sole problem is to determine whether there was refusal to bargain, in view of the terms of the contract and in the light of undisputed facts. In careful endeavor to isolate the precise issue calling for decision we face no obligation to determine whether, by breach of a no-strike agreement, the union surrendered bargaining rights preserved for it by the Act, even though the Labor Board has, upon occasion, itself come to that conclusion, In re Scullin Steel Co., 65 N.L.R.B. No. 219; In re Joseph Dyson and Sons, Inc., 72 N.L.R.B. No. 82, in respect to violations of § 8(1) on the one hand, and violations of § 8(3) on the other. Moreover, we give consideration to the rule proclaimed by the Labor Board in In re Consolidated Aircraft Corporation, 47 N.L.R.B. 694, that it has no power under the Act to police collective bargaining contracts between employers and labor organizations, and to the view expressed in Terminal Railroad Association of St. Louis v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 6, 63 S.Ct. 420, 423, 87 L.Ed. 571, where Mr. Justice Jackson, speaking for a unanimous court, said, "The Railway Labor Act, [45 U.S.C.A. § 151 et seq.], like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions * * *. So far as

the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions."

■ Had the contract here involved contained no procedures for the adjustment of grievances, we would have a different case and one which need not here be adjudicated. Adjustment of grievances by conferences between grievance representatives of management and grievance committees of the union and leading, in the event of failure, to arbitration, is itself a bargaining process, and we know of no mandate of the law that bargaining must be undertaken and pursued in a particularized manner, excluding every other. The only standard of compliance we are aware of is that bargaining shall be undertaken and pursued in good faith. No provision of the Act, either expressly or by reasonable implication, limits the right of employer and employees to agree upon the mode in which bargaining is done. Nor is there denial of the right of a collective bargaining agent to seek, or the obligation of an employer to consider a request to amend an existing contract. That is not this case. Nowhere in the record is there evidence that the union sought to change its contract with the company. The contention that a request to negotiate in respect to the causes of the strike or other grievances outside the grievance procedures of the contract is impliedly a demand upon the company to negotiate a change in the contract, only begs the question, for if every grievance, however important or unimportant, is a request to change the contract, then the parties are back where they started, and the written agreement with its detailed procedures for adjusting grievances, is truly but a "scrap of paper."

Having thus narrowed the issue to the question whether in the circumstances disclosed, and in the light of contractual terms, the company refused to bargain by its several inter-party communications, we come to consider more particularly the precise circumstances upon which the Board relied. They relate to the position of the company

in respect to the causes of the strike, to the grievances initiated prior to the strike, and to the question of subcontracting.

It must be remembered in considering the causes of the strike, that no grievances had been filed in accordance with the terms of the contract. The record discloses no categorical refusal to bargain. The company's position was that it would negotiate in respect to the causes of the strike if the breach of contract were repaired, the men put back to work and grievances filed in accordance with the grievance procedures. Indeed, the company went further,—it offered to eliminate certain steps in the procedure which might have delayed adjustment, and to pass at once to the final steps provided. This was an offer reasonably in pursuit of the bargaining process. To construe it as refusal to bargain can be justified only by the fact that the offer was not made in good faith. Not only is there no finding by the Labor Board that the proposal of the company was made in bad faith pursuit of a purpose to avoid bargaining, but there is not a scintilla of evidence that would support such a finding if made, and its earlier and subsequent bargaining history repels any inference in that respect. The same is true of the failure to complete an adjustment of grievances in process through the grievance procedures of the contract when the strike was called. The strike was in breach of the agreement and the company proposed to carry on within its terms when the men went back to work,—a proposal again within the normal processes of collective bargaining.

■■ The declination to confer with the union upon the question of subcontracting, is of somewhat narrower scope and involves the coverage of the management clause of the agreement. The company viewed the subject matter of the union's proposal as within its exclusive prerogative. It had always engaged in subcontracting, it had been engaged in subcontracting at the time the first collective bargaining agreement with the union had been concluded, it was engaged in subcontracting when the 1943 contract went into effect. No grievances had been filed in respect to it if we except the abortive grievance in July, which was never pressed. The practical construction put upon the management clause by both parties was, without controversy in the record, that subcontracting was a function of management. But be that as it may—the dispute as it finally developed, was a dispute as to the interpretation of the management clause, and the contract specifically provided that such disputes were to be settled within the grievance procedures, and if they failed, by arbitration. Other disputes as to interpretation had been so decided. The purpose of bargaining is to reach agreement resulting in a contract binding on both parties and providing the framework within which the process of collective bargaining may be carried on. N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682, N. L.R.B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632. The contention that the subject of contracting is not an appropriate matter for determination through grievance procedures, must fail in the light of subsequent history, for apparently there was no difficulty in reaching an agreement on the management clause of the 1946 contract. There the rights of the company were made more specific without any reservation by the union of the right to participate in decisions on subcontracting. Notwithstanding some intimations to that effect in a different setting [Hughes Tool Co. v. N.L.R.B., 5 Cir., 147 F.2d 69, 158 A.L.R. 1165] we do not view the term "grievances" as a term of art having a connotation differing from its meaning in ordinary use. Even if so, the contract uses broader language than the term "grievances"—"should differences arise between the company and the union as to the meaning and application of the provisions of this agreement." Undoubtedly there were such differences and under the contract they were to be resolved in the manner therein outlined.

■ Though the duty to bargain is absolute, it may be channeled and directed by contractual agreement. N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874. There is here no restriction in the contract on the obligation of the petitioner to bargain as in N.L.R.B. v. Highland Shoe Co., 1 Cir., 119 F.2d 218, and the petitioner sought not to curtail the process but to uti-

956

lize the contractual mechanisms for its prosecution. The law invites, though it may not compel, a collective bargaining agreement. If adjudication bases no sanctions on commitments made therein by the bargaining agent, it imparts futility to a bargaining process hopefully developing in the interest of industrial peace. If the law penalizes one party to the contract for standing on a bargain not itself violative of law, there may still be compulsion to bargain, but the virtue of agreement vanishes. It may well be that industry will concede much for a no-strike covenant and orderly grievance procedures. It may also result that it will concede little for promises, the performance of which may be insisted upon only at the risk of condemnation for unfair labor practices. The law, we think, does not compel such result.

Our conclusion is that the petitioner did not commit any unfair labor practice; that its effort to channel collective bargaining within the provisions of a contract with the union, was not a refusal to bargain; that there is no finding and no evidence that would sustain a finding that its effort so to do was in the exercise of bad faith; that the controlling question is one of law and not of fact and so within the competence of this court to decide; wherefore,

The petition to set aside the Labor Board's order is granted and the petition by the Labor Board for its enforcement is denied.