NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

KNIGHT MORLEY CORPORATION,
Respondent.

No. 13116.

United States Court of Appeals
Sixth Circuit.

Dec. 18, 1957.

Rehearing Denied Feb. 13, 1958.

Owsley Vose, Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Rose Mary Filipowicz, Atty., N. L. R. B., Washington, D. C., on the brief), for N. L. R. B.

John F. Langs, Detroit, Mich. (Richard F. Molyneaux (of Langs, Molyneaux & Armstrong), Detroit, Mich., on the brief), for Knight Morley Corp.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This case arises on petition for enforcement of a decision and order of the National Labor Relations Board which held that respondent had violated Section 8(a) (1) (3) and (5) of the Labor Management Relations Act, 1947, 29 U. S.C. § 141 et seq., 29 U.S.C.A. § 141 et seq., and ordered reinstatement with back pay of certain employees whom it found to have been improperly discharged.

While the material evidence is in sharp controversy, the trial examiner and the Board found, based upon substantial testimony, the following facts:

Respondent operates a manufacturing plant at Richmond, Mich., engaged in the production of rear view mirrors and other automobile accessories. Its bargaining contract with the union, CIO, contained a no-strike clause. Under Mich.Stat.Ann. Sections 17.26 and 17.36 to 17.39, Comp.Laws 1948, §§ 408.66, 408.77–408.80, respondent was required to provide in its buffing room exhaust fans for the purpose of carrying off dust from emery wheels and grinders and dust-creating machinery. Sections 17.36 and 17.37 read together require that blowers and hoods be provided to protect the persons using buffing wheels from dust produced thereby and to catch and dispose of the dust thrown off by centrifugal force.

The initial difficulty in the immediate case arose out of the breakdown of respondent's blower system in its buffing room. Beginning Friday, August 21, 1953, the blower, which when in operation properly sucked up much of the dirt, dust, lint and abrasives thrown off in the buffing process, was out of order on various occasions. Serious

trouble arose on August 28 when a fire destroyed the switchbox which controlled the blower. On Saturday, August 29, a new switchbox was installed but in this operation the wires of the motor were reversed. This caused the fan to run in reverse so that there was not enough suction in the blower system to draw off the waste material resulting from the polishing and buffing. On Monday, August 31, because of this situation, the morning shift of buffers was sent home after two hours work. The blower pipes were immediately cleaned, but in the afternoon of August 31 the blower still blew dirt, grit and abrasives into the men's faces, irritating eyes, ears and throats. On this day the temperature was from 96° to 98° in the shade and the atmosphere was very humid. A thermometer inside the buffing room showed the temperature there to be 110°. The buffers complained through their union steward and the union president to their foreman and to management. Respondent's president, Morley, made a cursory examination, putting his hand near the wheels of some of the buffing machines. He testified that the blower sucked in smoke from his cigar. Morley concluded that the blower was operating properly and rejected a suggestion from an experienced employee that the wires should be reversed. It was shown by the great weight of the testimony that the blower system on this day did not dispose of much of the dirt. The buffers, through their union steward and president, asked permission to stop working, but were told that they must continue and that anyone who left the plant would be discharged. All 17 of the afternoon buffers walked out of the plant at 5:15 p. m. Several of them testified at the hearing that they believed it would be injurious to their health to work under the conditions of the heat and dust.

On the morning of September 1 there was no improvement in the operation and the rest of the men threatened to leave if the blower was not fixed. One buffer, Herbert Fox, was told to quit if he wanted to lose his job and he immediately quit. Thereafter Morley had the wires changed to the proper position. The blower then operated normally. When the afternoon buffers returned to work September 1 they learned that they had been discharged.

At the time the union was in process of negotiating a new contract with respondent, the original contract being due to expire on September 25, 1953. The union protested discharge of the 17 buffers and, in accordance with its collective bargaining contract which established a detailed grievance procedure, it submitted a formal written grievance with reference to the matter. As to this grievance, the first four steps of the grievance procedure were followed by the parties, but neither party receded from its position, respondent asserting that the buffers had been discharged for violation of proper management orders. Under step 5 of the grievance procedure it was optional with the parties to proceed to arbitrate. Neither party pursued arbitration to settlement of the particular controversy. Upon the ground that the grievance procedure should have been followed to its ultimate conclusion, respondent refused to bargain on matters relating to the buffers' discharge in connection with negotiations for a new collective bargaining contract.

No meeting was held with respondent after September 25 and on September 30 two thirds of the employees walked out on strike, although Morley sent them word and also told them personally that they would be discharged if they ceased work. Respondent then notified all strikers to return to the plant by October 5 and, as to those who did not return, cancelled group insurance and treated their employment as terminated.

The Board found that the buffers quit work in good faith because of abnormally dangerous working conditions and that respondent violated Section 8(a) (1) and (3) of the Act in discharging them. It decided that in spite of the no-strike provision of the bargaining contract the cessation of work by the 17 buffers was protected under Section 502 of the Labor

Management Relations Act of 1947, 29 U.S.C. § 143, 29 U.S.C.A. § 143, the pertinent portion of which provides that "the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees" shall not be "deemed a strike under this Act." The Board also decided that respondent violated the statute by discharging 86 other employees who struck in protest against respondent's unfair labor practice; in dismissing the buffers and in refusing to reinstate certain employees who applied for reinstatement; and by threatening to discharge its employees if they went out on strike. Lastly the Board found that respondent violated Section 8(a) (1) and (5) of the Act by refusing to bargain with its employees' union representative in regard to the discharged buffers' grievance, and by insisting that any new contract apply only to employees who had not struck.

■ We deem it unnecessary to discuss every point raised by astute counsel for respondent. The contention that the Board improperly found that respondent, in violation of Section 8(a) (1) of the Act, threatened to discharge several employees if they joined the strike of September 30, was raised neither before the trial examiner had issued his intermediate order nor before the Board and therefore we do not consider it. Section 10(e). Cf. Federal Power Commission v. Colorado Interstate Gas Company, 348 U.S. 492, 497–502, 75 S.Ct. 467, 99 L.Ed. 583; National Labor Relations Board v. Vulcan Forging Company, 6 Cir., 188 F.2d 927, 929–930.

■ The Board's decision depends largely upon questions of fact as to which it made findings which are vigorously attacked by respondent. The findings are sustained by substantial evidence upon the record considered as a whole and in general the Board must be sustained.

Respondent contends that the discharge of the buffers held to be wrongful cannot be considered because respondent had no notice until the filing of the amended complaint on July 30, 1954, of the charge that the buffers' cessation of work on August 31, 1953, was protected under Section 502 because the 17 buffers in good faith believed that conditions in their workroom were abnormally dangerous. The charge filed October 14, 1953, complained that on Monday, August 31, respondent discharged its employees in the buffing room because of their activities "in attempting to obtain correction of a faulty blower system." The amended charge filed December 11, 1953, set up that respondent, on or about Monday, August 31, 1953, discharged "all its employees in the buffing room because of their concerted activities in attempting to obtain correction of a faulty blower system." Both charges were filed within the six-month period specified in 29 U.S.C. § 160(b), 29 U.S.C.A. § 160(b).

■ The purpose of a charge is to set in motion the machinery of an inquiry. National Labor Relations Board v. Westex Boot & Shoe Co., 5 Cir., 190 F.2d 12, 13; National Labor Relations Board v. General Shoe Corporation, 6 Cir., 192 F.2d 504, 505. The charge is not a pleading. National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579; National Labor Relations Board v. General Shoe Corporation, supra, 192 F.2d 505; Kansas Milling Co. v. National Labor Relations Board, 10 Cir., 185 F.2d 413, 415. The strictness of formal pleadings should not be required therein. Kansas Milling Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Kingston Cake Co., Inc., 3 Cir., 191 F.2d 563, 567.

Obviously both charges related to the entire transaction with reference to the faulty blower and the conditions which it produced in the buffing room, including the cessation of work by the 17 buffers. National Labor Relations Board v. Kohler Company, 7 Cir., 220 F.2d 3, 7. Under the Regulations, Sec-

tion 102.14, 29 U.S.C.A.Appendix, the union was required to serve respondent with a copy of the charges and the regional director "as a matter of course" was instructed to mail copies to respondent. Under Section 101.4 respondent was "asked to submit a written statement of his position in respect to the allegations" in the charge. As respondent does not deny having received a copy of the charges, under the established presumption as to regularity of proceedings required by statute, we assume that respondent was properly served with the charge and amended charge. It certainly had notice of the union's complaint as to conditions in the buffing room and, of course, had notice of the application of Section 502 to this situation.

■ Respondent also urges that there was no competent testimony as to physical conditions inside the buffing room on the afternoon of August 31. However, the heat was shown to be 110° by thermometer, the humidity was stated to be great, and it was shown that the humidity was increased by the failure of the blowers to change the air. It was competent for the buffers themselves to testify to these physical conditions and to the lack of evaporation in the room. Laymen may testify as to physical conditions which they themselves have observed. Lincoln v. Central Vermont Railway Company, 82 Vt. 187, 72 A. 821. This rule applies to statements as to temperature, the state of the weather, and dampness. Leopold v. Van Kirk, 29 Wis. 548. Curtis v. Chicago & Northwestern Railway Company, 18 Wis. 312 [Reprint p. 327].

Another point of attack was the claim that the record presented no competent testimony as to the fact found by the Board that conditions in the buffing room were "abnormally dangerous." These conditions were testified to by Dr. William Fredrick, an industrial health expert, who had made this his life work since he graduated in 1936 from the University of Michigan with a Doctor of Science degree. Dr. Fredrick was highly qualified, having been a past officer of the American Industrial Hygiene Association, a fellow of the American Public Health Association and past president of its Industrial Hygiene section, a member of the American Chemical Society, the American Association for the Advancement of Science the Association of Analytical Chemists, and the Engineering Society of Detroit.

Respondent contends that only a physician could rightly testify with reference to the danger to health arising from the failure of the blower to operate under the conditions presented. No decision is cited in support of this contention.

■ Industrial hygiene is the science and art of insuring healthful conditions of work, and the prevention of occupational diseases or injury to health arising out of methods of work. While perhaps only a physician could testify as to diagnosis of disease, lay witnesses may testify as to the existence of disease, or as to conditions producing disease which fall within their immediate knowledge and experience.

■ The possibility that actual disease may be caused by conditions in plant and in industrial operations is emphasized in this case by the fact that the Michigan statute requires the installation of the blower involved here. This is due to the well-known tendency of grit and abrasives such as Tripoli (used in respondent's plant) to cause diseases of the lungs. Dr. Fredrick's testimony was rightly admitted.

■ Dr. Fredrick testified in substance that under the conditions of heat and excessive humidity described as existing in the buffing room, combined with failure of the blower, working conditions were dangerous to health. He stated that with the wires on the blower reversed it was reasonable to assume that the blower's efficiency was decreased from 70% to 80%. He said he had personally known of such cases in which the efficiency of the blower went to zero.

Assuming such a reduction in blower efficiency, it was shown that air changes in the buffing room would be reduced from about 36 per hour to between 6 and 7 per hour. Due to the reversal of the blower fan, Dr. Fredrick stated, the suction would be reduced to practically zero at the buffer hoods. Heat generated inside the buffing room by numerous motors substantially increased the temperature. Under such circumstances Dr. Fredrick expressed the opinion that employees working in the buffing room might within two or three hours experience acute effects of some form of heat disease, such as heat prostration or heat stroke, and that even more serious results might follow if work were continued. It was clearly shown that the failure of the blower directly affected not only the accumulation of dust, grit, and dangerous abrasives, but also the temperature and humidity in the buffing room. This was substantial testimony to the effect that the conditions might reasonably be considered "abnormally dangerous." Cf. National Labor Relations Board v. Southern Silk Mills, Inc., 6 Cir., 209 F. 2d 155. As the men left the room after one hour and forty-five minutes of work, the fact that none of them collapsed is not decisive as to the physical conditions.

■ Respondent also urges that the Board's decision on this point was erroneous because under the Michigan statute the blower was not required to effect ventilation. It is true that the statute does not mention general ventilation and cooling. However, the requirement of a blower system includes whatever functions the blower, effectively operating, will perform, such as the reduction of humidity by changing the air. It would be a strange doctrine to hold that under Section 502 employees in appraising the abnormal danger of working conditions were limited to consider only the purposes of safety equipment expressly described in the statute. The heat and humidity, as well as the accumulation of dust, grit and abrasives caused by the failure of the

statutory mechanical devices, joined in creating the abnormal danger. The fact that all 17 employees walked out in face of Morley's statement that the blower was operating properly is evidence that the action was "concerted" and the Board was entitled to find that it was taken in good faith belief that the continuation of these conditions was and would be abnormally dangerous.

■ Moreover, it was not error for the Board to decide that under these circumstances it was immaterial that the bargaining contract contained a no-strike clause. Since Section 502 provides that walking out under a good faith belief of abnormally dangerous conditions does not constitute a strike, the no-strike provision was not applicable. National Labor Relations Board v. Kohler Company, supra, does not require a different conclusion. The cases are distinguishable on the facts. Moreover, in the Kohler case Section 502 was not relied on nor construed. That section expressly limits the right of management to require continuance of work under what the employees in good faith believe to be "abnormally dangerous" conditions. The refusal to work here came squarely within the terms of the statute and did not constitute, as held in the Kohler case, supra, an unlawful insistence on remaining at work on the men's own terms and conditions.

■ Respondent also attacks the Board's conclusion that respondent's insistence that the grievance concerning the buffers' discharge should be handled through grievance proceedings rather than as a part of the negotiation for a new contract violates Section 8(a) (5) and constitutes refusal to bargain. The trial examiner found to the contrary, basing his conclusion largely upon the decision of this court in Timken Roller Bearing Company v. National Labor Relations Board, 161 F.2d 949, 955. The Board endeavors to distinguish the instant case from the Timken case, supra, upon the ground that the grievance as to the buffers' discharge had not been disposed of when the contract expired. While there were some factual differ-

ences between the Timken case and the instant controversy, the grievance there involved, as here, had not been settled and, this court held, the employer's effort to channel the grievance into agreed grievance procedures was not a refusal to bargain. This court approved and follow that case in National Labor Relations Board v. Standard Oil Company, 196 F.2d 892, 895. Here, as there, the duty to bargain could be directed by the parties through contractual agreement and such a contract had been executed. See also Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, in which the Supreme Court reversed a judgment of the Court of Appeals 5 Cir., 230 F.2d 81, and affirmed a judgment of the District Court which held that, when a grievance arose from the operation of the collective bargaining agreement and while it was in effect, the expiration of the bargaining agreement did not relieve respondent of its contractual obligation to arbitrate. We think the Board erred in deciding that respondent violated Section 8(a)(5) of the Act in dealing with the grievance.

 However, this conclusion does not require that the order be modified, for the Board also found that respondent on October 14 refused to bargain with the union as the representative of the striking employees, in violation of Section 8(a)(5) of the Act. The strike of September 30 was clearly an unfair labor practice strike. The strikers retained their employee status and their bargaining representative was entitled to recognition in their behalf. National Labor Relations Board v. Deena Artware, Inc., 6 Cir., 198 F.2d 645, 651, certiorari denied 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342; National Labor Relations Board v. Pecheur Lozenge Co., Inc., 2 Cir., 209 F.2d 393, 403, certiorari denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1099.

It is ordered that a decree shall issue enforcing the Board's order as prayed in the petition.

On Petition for Rehearing.

PER CURIAM.

The only point which requires discussion of the petition for rehearing is respondent's contention that it properly raised before the trial examiner the issue as to whether respondent, in violation of Section 8(a)(1) of the National Labor Relations Act, threatened to discharge several employees if they joined the strike. In our opinion we did not consider that issue for the reason that respondent, as shown by citations in the Board's reply brief and not answered by respondent, had failed to file exceptions to the trial examiner's findings concerning alleged threats made by Morley, respondent's president, or to the examiner's conclusion that such threats violated the Act. The Board's reply brief was filed September 3, 1957, and respondent filed no answer thereto. The case was heard by this court October 22, 1957.

Respondent now asserts that it stated at the hearing before us that it took an exception to the finding of the trial examiner, quotes the particular exception and states that counsel for petitioner at the hearing agreed that its objection on this point was improper. The appendix contains no exceptions to the trial examiner's report, including Exception No. 26 now relied on in respondent's petition for rehearing.

The danger of relying upon oral statements and upon claimed agreement with such oral statements, also orally stated, of which no memorandum is furnished the court is apparent.

The important question raised is whether the court has a right to rely upon the joint appendix filed in compliance with Rule 16 of the Revised Rules of this court effective May 1, 1956, 28 U.S.C.A.

 The purpose of the adoption of the rule as to the filing of appendices, whether separate or joint, is that litigants and counsel shall have the advantage of presenting a condensed record for the purpose of saving time and labor in preparation and the expense of printing voluminous transcripts of testimony.

The court is entitled to rely upon the appendix as presented. The rules of this court are liberal with respect to the filing of unprinted portions of the record as part of the appendix, even after the printed appendix has been filed. Under Rule 16(6), either party may file typewritten copies of such portions of the record as he desires at any time prior to the call of the case for argument; and such typewritten copies shall be considered as a part of the appendix. In this case respondent had some seven weeks prior to the hearing in the court to file such typewritten addition to the appendix but took no action. The petition for rehearing on this point has no merit.

In any event certain statements of respondent's president made to two employees could properly be considered by the examiner and the Board as threats constituting coercion. Since the examiner and the Board so found, there was ample support for the conclusion that respondent violated Section 8(a)(1) of the Act.

All questions raised in the petition for rehearing have been considered. It is ordered that the petition be and it hereby is denied.