CLARK ENGINEERING AND CON-
STRUCTION COMPANY,
Plaintiff-Appellant,

v.

UNITED BROTHERHOOD OF CAR-
PENTERS AND JOINERS OF
AMERICA, FOUR RIVERS DIS-
TRICT COUNCIL, et al., Defendants-
Appellees.

No. 74–1312.

United States Court of Appeals,
Sixth Circuit.

Feb. 17, 1975.

Charles S. Wible, Lovett, Wible & Lamar, Owensboro, Ky., for plaintiff-appellant.

Charles R. Isenberg, Segal, Isenberg, Sales & Stewart, Thomas G. Jarrell, Louisville, Ky., for defendants-appellees.

Before WEICK, EDWARDS and McCREE, Circuit Judges.

WEICK, Circuit Judge.

Clark Engineering and Construction Company (Clark), a Kentucky corporation, brought suit in the District Court against the defendant labor organizations under Section 303 of the Labor Management Relations Act (LMRA) as amended, 29 U.S.C. § 187, alleging that activities of the labor organizations at a Murray State University construction project, in Murray, Kentucky, violated Section 8(b)(4) of the National Labor Relations Act (NLRA) as amended, 29 U.S.C. § 158(b)(4).

The case was tried before a jury which returned a verdict in favor of the defendant labor organizations, upon which verdict judgment was entered dismissing the complaint. Clark appealed.

On October 16, 1969 the State of Kentucky awarded Clark a contract of over $5,000,000 for construction of a football stadium, with underground classroom facilities, on the campus of Murray State University. Clark subcontracted some of the work. A short time after being awarded the contract Clark agreed to hire members of various building trades locals at the wage scales specified in their area collective bargaining agreements. The agreements between Clark and the local unions expired on or about May 31, 1971. During the time of the activities which are the basis of Clark's action, none of the labor organizations had a collective bargaining agreement with Clark, and no labor organization was certified by the National Labor Relations Board as the representative of Clark's employees.

The carpenters employed by Clark continued to work under the terms of the old agreement until July 1, 1971. The

United Brotherhood of Carpenters Local, however, insisted that Clark sign a letter of intent to be bound by whatever agreement might be finally reached between the Carpenters Local and the Associated General Contractors. Clark did not want to agree in advance to be bound by any agreement that the Association might enter into, and decline to sign the letter of intent. The Carpenters then began picketing at the construction site, informing Clark that they would not return to work until the letter of intent was signed.

Clark erected a single-wire fence around the entire construction site. The fence had two entrance gates, separated by about 180 feet. Gate 1 was reserved for Clark and nonunion or open shop subcontractors and their material suppliers. Gate 2 was reserved for the neutral union subcontractors and their material suppliers. Clark posted large, clearly-worded, appropriate signs at the gates. The Carpenters then complied with the notice and limited their picketing to gate 1, thereby avoiding violating Section 8(b)(4) of the NLRA.[1] The union subcontractors' employees began using gate

2 and resumed work. The Carpenters picketed until August 30th or 31st, 1971. They had not settled their dispute with Clark when they stopped picketing.

On Friday, September 10, 1971 three members of the Safety Committee for the West Kentucky Building and Construction Trades Council visited the construction site, stating to Clark's job superintendent that they had received reports of safety violations on the job. They asked the superintendent to accompany them on an inspection of the project, but he refused. No employee had previously made any complaint to him concerning working conditions. The members of the Safety Committee inspected the job and claimed to have found several safety hazards. The Trades Council began picketing at both gates on the following Monday, September 13, 1971.

The picket sign read: "This job is unsafe and unsanitary. West Kentucky Building Trades Council." It seems to be a coincidence that on the same day two inspectors for the Kentucky Department of Labor inspected the job site and found fifteen sanitary and safety viola-

---

1. 29 U.S.C. § 158(b)(4) provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

tions.[2] The construction had been in progress for nearly two years without any complaint by the Department or by any employee.

Two of the subcontractors whose employees used gate 2 were the Tilford Plumbing & Heating Co. and Riley Electric Co. These subcontractors were responsible for plumbing and electrical work that had to be completed prior to placing of concrete by Clark's employees. Their employees, except for Riley's foreman, refused to work while picketing at gate 2 continued.

Picketing continued at gate 2 until September 24, 1971. The State Inspector and a member of the Safety Committee of the Labor Council testified that safety conditions had improved by September 21st; however, they also testified that there were some safety problems uncorrected. Pickets were removed on the morning of September 24th, and members of the defendant-appellee unions returned to work.

In its appeal Clark contended (1) that the District Court erred in its instruction to the jury that § 502 of LMRA provided a defense to a secondary boycott conducted by the defendant unions against neutral employers; (2) that the Court erred in its admission of incompetent evidence and in the exclusion of competent evidence; and (3) that the Court erred in denying plaintiff's motion for a directed verdict. We reverse.

### I

Section 502, in relevant part, provides:

Nothing in this chapter shall be construed to require an individual employee to render labor or service without his consent, nor shall anything in this chapter be construed to make the quitting of his labor by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service, without his consent; *nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this* chapter. (Emphasis ours.) (29 U.S.C. § 143)

Only the italicized portion was claimed to be applicable to this case.

The District Court instructed the jury with respect to this section as follows:

The Defendant Unions admit the picketing at the time and place claimed; that is, at both gates between the dates of Monday, September 13 through Friday, September 24, 1971, but deny that the Unions were engaged in any unlawful or unfair labor practice as prohibited by Section 8(B)(4)[b] of the National Labor Relations Act, which I just read you.

The Defendant Unions contend that their members quit working at and picketing the Clark Engineering job site on September 13, 1971, in good faith because of dangerous working conditions at that place of employment and that they ceased such picketing and returned to their jobs after much of the dangerous conditions at the work site had been remedied.

Of course, the Plaintiff Clark claims that such contention by the Defendant Unions of dangerous working conditions was and is a false, sham claim or defense. If the Defendant Unions'

---

**2.** Clark's job superintendent, Owen Keelen, testified that on the same day he immediately suspended production and corrected the alleged unsafe conditions. He did not agree that the conditions were unsafe. Nevertheless, the picketing against neutral employers continued. Other inspections were made by inspectors for the Kentucky Department of Labor, and corrections were made until the inspectors finally reported that everything was in good condition. Clark offered proof of the neutral subcontractors that the working conditions were not unsafe.

In the summer of 1971 Business Agent of the Plumbers Union Kindred met with one of the inspectors for the Kentucky Department of Labor at a convention of the Kentucky Building and Construction Trades; they discussed safety conditions at the Murray Stadium project. The Business Agent did not point out any conditions of the project which he considered to be dangerous. (A. 95–96.)

claim is believed by you to be true, then the Defendant Labor Organizations would not have violated Section 8(B)(4)[b] of the Labor Act for the reasons of the existence of Section 502 of the Labor Management Act which reads pertinent part as follows:

"Nothing in this Act shall be construed to require an individual employee to render labor or service without his consent, nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions of work at the place of employment be deemed a strike under this Act."

However, if you, the jury, should conclude that the employees in their good faith did not believe that there existed abnormally dangerous condition at this place of employment or if you should believe that such dangerous conditions, in fact, did not exist, then this would not be a valid defense for the Defendant Unions against the claim of Mr. Clark in this lawsuit. . . . (A. 137–138)

Thus, the factual issue to be determined by you in this case is:

(1) Was one of the objects of the picketing by the Defendant Unions between the period of September 13 and September 24 and [sic] object prohibited by 8(B)(4)[b] of the National Labor Relations Act, or, on the other hand, was the sole object of the Defendant Labor Organizations activities in such picketing during such period one taken in good faith because of the existence of abnormally dangerous conditions at the place of employment. (A. 140)

■ In our opinion the District Court erred in instructing the jury on Section 502. It was not pleaded as a defense. The Section, even if applicable, does not authorize a secondary boycott in violation of Section 8(b)(4) of the National Labor Relations Act, as amended.

Section 502 authorizes the quitting of labor *by an employee or employees* in good faith because of abnormally dangerous conditions of work. The section does not mention a labor union; it is addressed solely to the rights of individuals.

Clark does not question the right of "an employee or employees" to quit work under such condition. There was no proof that any employee ever made a complaint to Clark or his supervisors concerning working conditions.

What the Trades Council and the unions were attempting to do was to conduct a secondary boycott against neutral parties who were not concerned with the Council's and unions' controversy with Clark. The unions could picket to their hearts' content so long as they confined their picketing to gate 1.

The distinction between employee individual rights and union acitivity with respect to § 502 was recognized and pointed out in Marble Prod. Co. v. Local 155, United Stone & Allied Workers of America, 335 F.2d 468 (5th Cir. 1964).

Section 8(b)(4) is violated only if one of the objects of a union's activity is an object prohibited by the Section. The dual Congressional objectives were to preserve "the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 689, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

Section 502 does not create an exception to this principle. Therefore, it was irrelevant to the jury's consideration of the case.

■ Section 502 serves an entirely different purpose. When an employee is exposed to abnormally dangerous working conditions and quits work in good faith because of such conditions the section protects him from employer retaliation. The employee cannot be discharged, NLRB v. Knight Morley Corp., 251 F.2d 753 (6th Cir.), cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1958); the employer cannot resort to a lockout, Philadelphia Marine Trade Ass'n v. NLRB, 330 F.2d 492 (3d Cir.), cert.

denied, 379 U.S. 833, 841, 85 S.Ct. 65, 79, 13 L.Ed.2d 41, 47 (1964).

In Gateway Coal Co. v. UMW, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Court held that injunctive relief was appropriate to restrain a strike pending a final arbitral decision, holding that Section 502 did not deprive the District Court of authority to enforce a contractual no-strike obligation. The Court also cited with approval *Knight Morley, supra,* and *Philadelphia Marine Trade Ass'n, supra.*

It is to be noted that these cases all involved mere work stoppages on account of alleged unsafe working conditions. In none of the cases did the labor organizations contend that they had a right to conduct a secondary boycott because of alleged unsafe working conditions. Appellees have not cited a single case in support of such a proposition.

■ When a work stoppage properly results from abnormally dangerous working conditions, an employer cannot resort to the weapons available to him in an economically-motivated work stoppage. We agree with the Fifth Circuit that the very natures of the two types of work stoppage are entirely different. Marble Prod. Co. v. Local 155, United Stone & Allied Workers of America, *supra.*

The policy of LMRA § 502 is not involved in the present case. Clark did not have a contract with any of the defendant unions, nor did it employ the plumbers and electricians whose refusal to cross the picket lines slowed construction. Clark cannot discharge or lock out workers whom it does not employ.

The real purpose of the strike is shown by the conduct of the labor organizations.

Union business representative Kindred, prior to the start of the picketing, told Frank Riley, President of neutral employer Riley Electric Company, that the unions were going to "shut the job down regardless of who it hurt." Picketing was started at primary and secondary gates pursuant to this threat.

Henry Strohmeyer, foreman of Poe Steel Erection Company, a neutral employer, was asked a question whether he saw roofing nails in the entrance way to gate 2 (the neutral gate) and he answered, "Yes." Counsel for defendants objected to the question after it was answered and the Court sustained the objection. Testimony of Strohmeyer was proffered to the effect that as he was leaving the job on one occasion a steward of appellee Teamsters Union "pulled out a knife and told him that he would get him." The reason stated by the Court for not permitting this type of evidence was that it had not been pleaded. This issue will be discussed in the next topic.

It is obvious that the unions paid no attention to the reserved gates. We recognized and applied the reserved gate doctrine in NLRB v. Nashville Bldg. & Constr. Trades Council, 383 F.2d 562 (6th Cir. 1967). Other Circuits have followed. Markwell and Hartz, Inc. v. N.L.R.B., 387 F.2d 79 (5th Cir. 1967), cert. den. 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653; Orange Belt District Council of Painters No. 48 v. N.L.R.B., 124 U.S.App.D.C. 53, 361 F.2d 70 (1969); N.L.R.B. v. Northern California District Council of Hod Carriers and Common Laborers, 389 F.2d 721 (9th Cir. 1968); N.L.R.B. v. Lafayette Building and Construction Trades Council, 445 F.2d 495 (5th Cir. 1971).

## II

■ The trial court excluded evidence that roofing nails had been scattered in the entrance way to gate 2 (the neutral gate) and that threats had been made to the ironworker foreman of one of the subcontractors during the picketing by the Trades Council. Although Clark's Amended Complaint alleged that the defendants had "induced and encouraged individuals" and had "threatened, coerced, or restrained persons," the District Judge excluded the evidence on the ground that Clark had not pleaded "violence." (A. 90–91.) We disagree.

The words "induce" and "encourage" appear in § 8(b)(4). As a matter of stat-

utory construction this Court, in UMW v. Osborne Mining Co., 279 F.2d 716, 723 (6th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960), held:

. . . [I]t is clear that the words of the statute (29 U.S.C.A. § 187a) "induce" and "encourage" include every form of influence and persuasion whether by appeals to reason or coercion with force and violence. International Brotherhood of Electrical Workers etc. v. NLRB, 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299.

As a matter of statutory construction the words "induce" and "encourage" in § 8(b)(4) include the type of activity that Clark wanted to prove; this fact is persuasive that, as a matter of pleading, such words are sufficient. Certainly the words "threatened, coerced, and restrained" should be sufficient. See Conley v. Gibson, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); 2A Moore's Fed. Prac. ¶ 8.13.

We agree with appellees that violence does not change primary picketing into illegal secondary picketing. United Steelworkers v. NLRB, 376 U.S. 492, 501, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); Bedford-Nugent Corp. v. Teamsters Local 215, 358 F.2d 21, 24 (7th Cir.), cert. denied, 385 U.S. 821, 87 S.Ct. 48, 17 L.Ed.2d 59 (1966). However, Clark does not urge that violence does have that effect.

It was the picketing at gate 2 and the coercion by force and violence that constituted illegal secondary picketing.

If secondary boycotting can be justified whenever a claim of unsafe working conditions is made, then the Reserved Gate Doctrine can be circumvented and Section 8(b)(4) of the National Labor Relations Act nullified.

### III

In its answer to the amended complaint the defendant unions pleaded as a defense thereto the following:

2. The Defendants, and each of them, state that the allegations contained in paragraph III of the Amended Complaint alleging Defendants, and each of them, violated Sections 8(b)(4)(i) and (ii) of the National Labor Relations Act, as amended (29 U.S.C. 158(b)(4), were contained in unfair labor practice charges brought against each of the Defendants by the Plaintiff Corporation on September 23, 1971. These charges were filed by the Plaintiff Corporation with the National Labor Relations Board, Region 25, and were dismissed by that Region on November 18, 1971. The Defendants state further that the Plaintiff Corporation appealed from the dismissal of the aforesaid charges to the Office of the General Counsel of the National Labor Relations Board on November 26, 1971, which appeal was denied by the Office of the General Counsel on January 6, 1971.

Clark filed a motion to strike said paragraph as an insufficient defense. The motion came on to be heard before District Judge Charles M. Allen, who granted the motion and ordered the paragraph stricken in a Memorandum Opinion, and an order issued subsequent thereto. Judge Allen relied on the decision in Local 290, Aircraft & Engine Maintenance etc. v. I. E. Schilling Co., 340 F.2d 286 (5th Cir. 1965) and other cases cited in his Memorandum. This order has never been vacated.

Notwithstanding the decision, the defendants included in their list of exhibits served on the plaintiff, letters from the Regional Director and General Counsel of NLRB, in support of the paragraph in their answer which had been stricken. Plaintiff filed objections to these exhibits, which objections were overruled by the District Judge who presided at the trial (not Judge Allen).

In his opening statement to the jury defendants' counsel stated:

Now, Mr. Clark, President of Clark Engineering & Construction Company, instructed his attorney, and his attorney, in his behalf, filed unfair labor practice charges against all of these Defendants that are here today, and in his charges, he alleges that they were

violating the Secondary Boycott provisions in the law.

A man from the National Labor Relations Board came down; he took affidavits; he took statements; he investigated from both sides, and a short while later a letter came to Mr. Clark and I got it, as the lawyer for these people, and the Regional Director of the National Labor Relations Board said:

"There is insufficient evidence.

We think these people didn't break the law."

And, I will read you the letter later, and then, Mr. Clark appealed to the General Council [sic] in Washington, of the National Labor Relations Board, and he said,

"These are the facts—",

in a great, big, long appeal, and six months later, long after the picketing had stopped—we only picketed ten days, September 13th to the 24th, and really, not ten days, because our evidence will show the picketing stopped on about 11:30 or 12:00 o'clock that Friday, the 24th.

At any rate, the General Council [sic] of the National Labor Relations Board read all of the evidence that was submitted, and he, too, said:

"No, these Unions had a right to picket under the Section of the law that they were relying on."

That they had a good faith apprehension of their safety; that they—uh, the dangerous conditions existed, and he said:

"We are not going to issue a complaint. We don't think that they violated the law."

And, there the matter rested until Mr. Clark filed suit for damages here. We say to you that the picketing that we admittedly engaged in for the ten-day period was for safety. We think we may have saved somebody's lives. We are going to have the Safety Inspector, Mr. John Anderson, testify. He has been subpoenaed by both sides. I don't know who is going to call him

first, but he is here and he will testify what he found, and we are confident that after you hear the evidence you will agree with the National Labor Relations Board and with us, that we have not violated the law. Thank you. (A. 30–32)

Following this statement the Court charged the jury as follows:

By the Court: Ladies and gentlemen of the jury; I want to make one thing perfectly clear to you, and that is that the mention of the fact that this matter has been considered by the National Labor Relations Board is not conclusive against Mr. Clark; it doesn't prevent Mr. Clark from bringing a suit if he thinks he has one.

A proceeding before the Labor Board heard no witnesses. A determination was simply made from a written record by the General Council [sic] that the Union had a right to do what it did, but it is not conclusive or binding on you and you can consider it for evidentiary purposes, or you can disregard it entirely, but you must keep in mind that that decision was arrived at by him without hearing any oral testimony, or without the parties having the right to cross examine the people who were making the affidavits. (A. 32)

■■ The Court permitted the introduction of the letters to establish the defense. The letters were pure hearsay evidence and were not admissible. But even if they were not hearsay the action of the Regional Director and the General Counsel did not constitute a defense.

It was defendants' theory that the action of NLRB would have been res judicata if the charges had been filed, a complaint issued, and the case heard and determined by the Board on its merits. But this was not done. All that the Board did was to decide, *ex parte*, not to permit the charge to be filed. Such action was not admissible in the present case for any purpose.

Counsel for the unions was permitted to argue the issue to the jury, as follows:

I talk to you with some authority and with a bit of knowledge. I say this modestly, I say to you that when under the federal law a Union engages in picketing in violation of Section 8(b)4, and there is some more to it, (i)(ii)(B) and it is called secondary boycotting, that an unfair labor practice can be filed for the National Labor Relations Board and if the Regional Director of the National Labor Relations Board has a reasonable belief that the Unions were violating that section of the law, uh, a reasonable belief—not even, uh, you know, an absolute belief, then the Regional Director must go before the United States District Court and ask the Court to enjoin the picketing.

Such relief was asked for by Mr. Clark and on November 18, and you will take this (indicating) to your jury room and consider it, I hope, uh, the National Labor Relations Board said to Mr. Clark's lawyer:

"The above captioned case has been carefully investigated and considered and as a result of the investigation it appears that for the reasons outlined in a previous letter to you—"

I haven't seen the letter.

"—There is insufficient evidence of violation and further proceedings are not warranted at this time. I am therefore refusing to issue Complaint in this matter. Pursuant to the National Labor Relations Board Rules and Regulations you may obtain a review of this action by filing an appeal with the General Counsel of the National Labor Relations Board, Washington, D. C. and a copy with me. This appeal must contain a complete statement, setting forth the facts and reasons upon which it is based."

Well, Mr. Wible filed the appeal and being a competent lawyer, I am confident that he, in his appeal to Washington, in his statements setting forth the facts as to why he thought the Regional Director of the National La-

bor Relations Board was wrong, in saying these Unions were innocent, was completely and fully substantiating.

What happened? Along comes a letter on January 6 to Mr. Wible, uh, Mr. Clark's lawyer:

"Dear Mr. Wible;

Your appeal in the above matter has been duly considered and the appeal is denied. Under all of the circumstances and for substantially the reasons set forth in the Regional Attorney's letter of November 10, 1971."

I don't have that letter; that was sent to Mr. Wible.

"Further proceedings were unwarranted. Considering the fact that the gate number two picketing—"

And this is what he is complaining of, not gate one, but just gate two:

"—which referred only to unsafe working conditions began at exactly the same time that the safety violations were filed; terminated shortly after the Counsel was notified that the safety violations had been remedied and has not since been resumed, the evidence was deemed insufficient to establish that the picketing at gate number two was for an unlawful object as alleged."

Now, His Honor has admonished you that this is what the General Counsel of the Board decided. He did not decide this on the basis of a trial.

The reason there was no trial was because the Board did not think that these Unions did anything illegal, but yet we are here to answer the same questions, to go through that same routine. (A. 132–134)

■ The purpose of the motion to strike was to obtain an adjudication of the sufficiency of the defense. After the defense had been stricken the defendant was precluded from offering any evidence in support of it. Seaboard Sur. Co. v. Harbison, 304 F.2d 247 (7th Cir. 1962).

The District Court erred in permitting the letters to be used as exhibits contrary to Judge Allen's order striking the defense; it erred in its instruction to the jury to the effect that the jury could consider the action of NLRB as evidence but was not bound by it; and it erred in permitting counsel for defendants to include the defense in his opening statement to the jury, and to comment on it extensively in his closing argument to the jury, as if it were his principal defense.

In spite of all this treatment of the issue, counsel for appellee tells us that the action of the District Court at most is "harmless error." We disagree.

We do not pass upon the claim of error that the District Court should have directed a verdict in favor of plaintiff. Upon a new trial, with the inclusion of the excluded evidence and the exclusion of the incompetent evidence, the District Court may consider such a motion anew.

The judgment of the District Court is reversed because of the inclusion of incompetent evidence, the exclusion of competent evidence, and its erroneous instructions to the jury; and the case is remanded for a new trial.

McCREE, Circuit Judge (concurring).

I concur in the opinion of the court that the introduction into evidence of the determination of the National Labor Relations Board was error and that it was not cured by the district court's admonition to the jury that this determination was not binding or conclusive.

Since a new trial is ordered, I wish to make an observation about the nature of and the relationship between section 502 of the Labor Management Relations Act, 29 U.S.C. § 143 and section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4). Section 8(b)(4) prohibits unions from adopting specified sanctions against employers in order to achieve enumerated impermissible objects broadly described as secondary boycotts. Section 502, on the other hand, is intended to prevent employer reprisals against employees who refuse to work because of unsafe working conditions and does not, by its terms, apply to labor unions.

In instructing the jury at the new trial, the district court should focus its attention on the question whether appellant adduced evidence sufficient to prove that the union intended to effect an objective forbidden by section 8(b)(4). It is not impermissible under 8(b)(4) for a union to communicate to workers that a construction job is unsafe, when its purpose is to bring about the correction of such conditions. See Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 385, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The determination of the purpose or purposes for which picketing is undertaken is, of course, a question for resolution by the jury.

EDWARDS, Circuit Judge (dissenting).

In my view this record reveals a hotly contested, fairly conducted trial which contains no reversible error. In this respect I agree with Judge McCree that Section 502 does allow for concerted action by employees faced with "abnormally dangerous conditions for work," and that, assuming the conditions called for by Section 502 were present, the union's picketing at the reserved gate to advertise those conditions did not necessarily abrogate the Section 502 defense.

Further, I consider the question posed to the jury in the trial judge's instruction not only to be a fair statement of the issues in the case, but one which is consistent with the United States Supreme Court's interpretation of Section 502 entered in Gateway Coal Company v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), on January 8, 1974, six days after the judgment was entered in our instant case. The question is quoted in full below:

(1) Was one of the objects of the picketing by the Defendant Unions between the period of September 13 and September 24 and [sic] object prohibited by 8(B)4 of the National Labor Re-

lations Act, or, on the other hand, was the sole object of the Defendant Labor Organizations' activities in such picketing during such period one taken in good faith because of the existence of abnormally dangerous conditions at the place of employment?

There was, of course, a considerable amount of evidence to support the jury finding of good faith and the existence of abnormally dangerous conditions at the construction site involved.

Nor do I think that any of the District Judge's evidentiary rulings constituted reversible error.

The record shows that prior to the filing of this litigation, Clark Engineering had filed an unfair labor practice complaint before the National Labor Relations Board, which complaint had been dismissed after investigation but without hearing on recommendation of the Regional Director. Plaintiffs tendered evidence of this dismissal at the trial of this case, and the District Judge admitted it, admonishing the jury as follows:

> By the Court: Ladies and gentlemen of the jury; I want to make one thing perfectly clear to you, and that is that the mention of the fact that this matter has been considered by the National Labor Relations Board is not conclusive against Mr. Clark; it doesn't prevent Mr. Clark from bringing a suit if he thinks he has one.

> A proceeding before the Labor Board heard no witnesses. A determination was simply made from a written record by the General Council [sic] that the Union had a right to do what it did, but it is not conclusive or binding on you and you can consider it for evidentiary purposes, or you can disregard it entirely, but you must keep in mind that that decision was arrived at by him without hearing any oral testimony, or without the parties having the right to cross examine the people who were making the affidavits.

Subsequent thereto, the District Judge gave similar admonitions in relation to the same topic on two other occasions.

It seems clear to me that this material was admitted as a matter of evidence only and not as an affirmative defense, whether that be res judicata or collateral estoppel, both of which defenses had previously been ruled out by another District Judge on pretrial motion.

I do not read any of the Fifth Circuit cases relied on by appellants as holding that an administrative ruling of the Board on an unfair labor practice charge cannot be admitted as evidence for the jury's consideration for whatever it might be worth.

The only case cited by my brothers in support of reversal for a new trial on this ground is Aircraft & Engine Maintenance, etc., Local 290 v. I. E. Schilling Co., 340 F.2d 286 (5th Cir. 1965), cert. denied, 382 U.S. 972, 86 S.Ct. 528, 15 L.Ed.2d 464 (1966).

In that case, however, evidence of the Board's dismissal of unfair labor practice charges had presumably been admitted at trial where a jury had nonetheless found damages in favor of the employer in a case somewhat similar to our own. On appeal the union contended that the NLRB dismissal of the unfair labor practice charges "is res judicata and/or collateral estoppel to this action under Section 303(a)." *Id.* at 289. The Fifth Circuit very properly held that such evidence, where there had been no hearing before the NLRB, was not legal basis for vacating the jury award on grounds of either res judicata or collateral estoppel. The Fifth Circuit did not rule on the issue as a matter of evidence.

Further, there are two other Fifth Circuit cases in which the Board's finding (after hearing) of violations of Section 8(b)(4) was held to be res judicata in subsequent Section 303 suits for damages against the labor union there involved. *See* Texaco, Inc. v. Operative Plasterers and Cement Masons International Union, 472 F.2d 594 (5th Cir.), cert. denied, 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973); H. L. Robertson & Associates, Inc. v. Plumbers Local Union No. 519, 429 F.2d 520 (5th Cir. 1970). While as indicated above I recognize the

clear distinction between these cases and our instant case, I do think there is merit to appellee's suggestion that if the Board's adjudication, after hearing, of the existence of a secondary boycott can be considered res judicata, the Board's dismissal of such a complaint after investigation might appropriately be considered evidence for whatever the jury found it to be worth. The federal rules generally favor admissibility of evidence. Fed.R.Civ.P. 43(a). *See* Rule 803(8) of the Federal Rules of Evidence, Pub. L.No. 93–595 (January 2, 1975).

Other of appellant's objections appear to me to refer to matters which were within the discretion of the trial judge, or which might appropriately be considered harmless error on this record as a whole.

I believe the jury verdict in this case should be given effect and the judgment of the District Court should be affirmed.