LUCE & CO., S. EN C., Petitioner, *v.* LABOR RELATIONS BOARD OF PUERTO RICO, Respondent. LABOR RELATIONS BOARD OF PUERTO RICO, Petitioner, *v.* LUCE & CO., S. EN C., Respondent.

Nos. 67, 71. Decided November 5, 1962.

*Hartzell, Fernández & Novas* and *Héctor M. Laffitte* for the employer. *J. B. Fernández Badillo, Solicitor General, José Orlando Grau,* and *Rafael Buscaglia, Jr.,* for the Puerto Rico Labor Relations Board.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

This case presents two questions for decision, to wit: Is it an unfair labor practice under § 8(1) (d) of the Puerto Rico Labor Relations Act, 29 L.P.R.A. § 69, for a party to a collective bargaining agreement to refuse (1) to bargain and to submit to arbitration the clear and indubitable terms of a clause of an agreement because the other party objects to the exercise of the power granted thereunder, based on interpretations which do not conform to the terms nor to the literal sense of the provision, but which allegedly arise from conflicting assertions regarding the intention of the parties at the time of adopting the said clause?; (2) to bargain on changes in the working schedule when the other party objects thereto alleging that the circumstances which according to the agreement warrant such changes have not arisen?

We believe that, as a question of law, no such unfair labor practice has been committed in either of the two cases.

Let us examine the facts and the decision of the Puerto Rico Labor Relations Board.

Petitioner Luce & Co., *S. en C.*, signed a collective bargaining agreement for 1958 and 1959 with Unión Local No. 847 and Unión Local 801, as representative of its employees, both of which are affiliated to the Sindicato de Trabajadores UPWA-AFL-CIO.

On April 7, 1959 Unión Local 847 and the said Sindicato filed with the Board a charge of unfair labor practice against petitioner, pursuant to § 8(1) (a) and (f) of the Puerto Rico Labor Relations Act, 29 L.P.R.A. § 69, consisting in a violation of arts. IV and XI(f) of the existing collective bargaining agreement between the parties.[1] The Board filed

---

[1] Article IV reads as follows:

"WORKING TIME SCHEDULE

All work in the cultivation and gathering of the cane shall begin from seven (7) until eleven (11) in the morning and from twelve (12) noon until four (4) in the afternoon, except in case of force majeure or

a complaint against petitioner on April 9 of that year, in the name of complainants Uniones Locales 847 and 801 of the Sindicato, charging petitioner not only with a violation of the said provisions of the agreement but also with the refusal to bargain collectively, which constitutes an unfair labor practice under § 8(1) (d) of the said Act.[2]

After holding extensive hearings, the trial examiner designated by the Board determined, and the Board confirmed, that petitioner had not violated the provisions of clause IV of the agreement nor of clause XI (f) thereof, the latter being void. However, the said officer as well as the Board determined that petitioner violated the said par. (d) in refusing repeatedly to bargain with complainants the problem regarding the use of machines for cutting sugar cane; in making no attempt and, on the contrary, flatly rejecting complainant unions' proposal to submit the question to arbitration; and in failing to show any interest nor making any attempt to reach an agreement by arbitration respecting the changes in the time schedule fixed by art. IV of the collective agreement.

---

circumstances beyond the control of parties, such as interruptions in the grinding or the traffic caused by machinery breakage. This working time schedule may be changed from time to time by agreement between the EMPLOYER and the UNION or its delegate. The EMPLOYER may also fix additional shifts which shall commence at the termination of the previous shift, without detriment to the change also of the working time schedule of these special shifts by agreement between the EMPLOYER and the UNION or its delegate."

Article XI(f) reads as follows:

"(f) If during the life of this agreement THE EMPLOYER shall use in its ordinary operations any machine for cutting cane, before putting such machine in operation the respective UNION and THE EMPLOYER shall stipulate the terms and conditions. This provision shall not apply to the operation of machines to cut cane for experimental purposes. It shall be deemed that such machine is used for experimental purposes provided the daily average of cane cut does not exceed one hundred (100) tons during the grinding season."

[2] Paragraphs (a), (d) and (f) of subd. 1 of § 8 provide as follows:

"(1) It shall be an unfair labor practice for an employer acting individually or in concert with others:

"(a) To interfere with, restrain or exercise coercion upon, or to

Feeling aggrieved by such decision, petitioner filed a petition for review in this Court on February 9, 1960. On March 15, 1960 the Board filed in this Court a petition seeking enforcement of its order of January 28 of that year, issued by virtue of and pursuant to the foregoing conclusions, and at the request of this party, in which petitioner concurred, the Court agreed to consolidate both petitions for the purpose of considering and passing upon them jointly.

Petitioner assigns five errors. The first three actually hinge on the same question, namely, whether or not the Board erred in holding that petitioner refused to bargain collectively with complainants, in accordance with the provisions of par. (d) supra.

According to the Board, petitioner's refusal to bargain consisted partly in (1) refusing to raise before the Complaints and Grievances Committee,[3] in compliance with complainants' request, the problem of the use of machines to cut sugar cane, petitioner alleging that since it had not breached the agreement as respects the use of such machines, it had nothing to bargain. On the contrary, it suggested to

---

attempt to interfere with, restrain or exercise coercion upon his employees in the exercise of the rights guaranteed in section 65 of this title.

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

"(d) To refuse to bargain collectively with the representatives of a majority of his employees in a unit appropriate for collective bargaining, subject to the provisions of section 66 of this title.

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

"(f) To violate the terms of a collective bargaining contract, including an agreement to accept an arbitration award whether the same is or is not included in a collective bargaining contract; Provided, however, That the Board may dismiss any charge in which there is alleged a violation of this subsection, if the union that is party to the contract is guilty of a current breach of the contract or has not complied with an order of the Board concerning any unfair labor practice as provided by this subchapter."

[3] Article V of the collective bargaining agreement provides:

"COMPLAINTS AND GRIEVANCES COMMITTEE

"There is hereby created a Local Complaints and Grievances Committee in each locality affected by this agreement which shall be composed of two members designated by the UNION and by the

complainants to file pertinent charges before the Board alleging (2) petitioner's failure to make any attempt to submit to arbitration, as sought by complainants, the controversy regarding the use of the cutting machine which gave rise to the stoppage of April 3, 1959.

The record shows that every time the machine for cutting sugar cane was used there arose complaints and opposition by the laborers members of the respondents, their leaders alleging in their behalf that the machine was not the machine contemplated, that the use of machine to displace laborers was prohibited by art. XI(f) of the agreement, that it was not used for experimental purposes, and that on certain days over 100 tons of sugar cane had been cut by machine. Petitioner testified, on the contrary, that different types of machine to cut sugar cane had been used in the past; that the machine in question could be used in accordance with art. XI of the agreement; and that in that article it had been expressly agreed that such machine "is used for experimentation provided the daily average of cane cut during the grinding season does not exceed one hundred (100) tons"; that the use was not therefore limited to cutting 100 tons every day. Regarding the failure to make attempts to submit the question to arbitration, petitioner argued that a work stoppage having occurred as a result of the use of the machine

EMPLOYER. All complaints which may arise shall be heard before such Committee, and this Committee shall meet not later than the fifth day as of the filing of the complaint and shall have full authority to pass upon, by a majority and after conducting the corresponding investigation, all cases submitted for consideration. If this Committee is unable to reach an agreement within seven working days from the filing of the complaint, the matter shall be referred to a fifth member designated by the parties. The parties shall prefer, whenever possible, that an officer of the Conciliation and Arbitration Bureau of the Labor Department of Puerto Rico act as a fifth member or arbitrator. If they fail to reach an agreement within three working days following the previous seven days, the parties shall be free to take the matter before the corresponding agencies, as provided by law. In any complaint for layoff which may be decided in favor of the workman, the EMPLOYER shall pay for the time lost as of the date of his layoff and shall reinstate him in his employment."

permitted under clause XI(f) of the agreement, petitioner's obligation to arbitrate the dispute ceased.

The trial examiner concluded from the testimony of the parties, and the Board confirmed: that there was a conflict with respect to the parties' intention in incorporating par. (f) in clause XI of the agreement;[4] that, therefore, there was no agreement with respect thereto; that § 1241 of

[4] Robledo, witness for complainants, testified as follows (Tr. Ev. 442-43):

A.—They submitted a proposal which was not for an annual average of 10,000 tons of cane cut by machine. This proposal, namely, an average of 15,000 tons cut by the machine, 15,000 tons of cane in each grinding season, but not for experimental purposes, that is, ordinary work. We objected to that proposal and afterwards there was submitted another counterproposal of a daily average of 150 tons, and the Union was also in a position not to accept it until they finally agreed on a daily average of 100 tons for experimental purposes since...

"A.—The clause was originally drawn up by the Employer and the amendments were proposed by the Union for experimental purposes and they were not included in the original clause, and the average of 150 tons was reduced to 100. And the Union, after considering that the machine for cutting cane which they used in 1957, in the belief that that was the machine which they were going to use for cutting the cane during the present season, figured on that occasion that it needed 18 or 20 cane cutters to complete the work performed by the machine; in other words, 20 cane cutters and 5 tons of cane per man-day would cut 100 tons, and as a result of those considerations the members of the Arbitration Committee of the Union accepted a daily average of 100 tons of cane."

Villamil, witness for petitioner, testified (Tr. Ev. 409 and 425):

"...The original proposal was, that it be permitted to cut 2,000 tons of cane during the season with this type of machine, namely, for experimental purposes. There was submitted a counterproposal to Caraballo's proposal, which is that which appears at present in the agreement, namely, that a daily average of cane cut not exceeding 100 tons a day during the season would be considered experimental. Caraballo's statements, upon hearing this proposal, were: 'this is better than that which we proposed because the total tons of cane cut by the machine would depend on the number of days in the season.'

"A.—...According to the first proposal made by the laborers, which was the one I mentioned and according to which Caraballo claimed that 10,000 tons could be cut; and in the course of the discussion the employer made the proposal which appears there, and then Caraballo said to Robledo that that proposal was the best because there could be fewer days in the season."

the Civil Code, 31 L.P.R.A. § 3479,[5] is applicable to the situation, and that said paragraph was therefore null and void, and the complaint for violation of art. XI(f) of the agreement was dismissed.

In support of the nullity of the said provision for lack of intention to arbitrate the same, the Board cites the agreement made by the parties which put an end to the stoppage in question. It was then agreed that the parties would meet "for the purpose of clarifying the interpretation of subd. (f) of art. XI of the existing collective bargaining agreement," respondent agreeing not to use the machines for cutting cane if the Uniones furnished every day a certain number of workers, and upon failure to do so, respondent could then use the machines to cut the cane which could not be cut as a result of the workers' failure to report for work.

We do not believe that if the subdivision in question were actually null and void petitioner could use the machine freely, since the use thereof necessarily entailed a change or modification which affected substantially the working conditions and, therefore, such use was subject to consideration by and bound respondent to discuss the same before the Complaints and Grievances Committee when it was brought up by the Uniones by way of complaint, in accordance with clause V of the agreement. *Drake Bakeries* v. *Bakery Workers*, 370 U.S. 254 (1962); *Consolidated Aircraft Corp.* v. *N.L.R.B.*, 141 F.2d 785 (1944).

---

[5] Section 1241 of the Civil Code provides:

"Section 3479. Decision as to doubts; when doubts void contract

"When it should be absolutely impossible to decide the doubts by the rules established in the preceding sections, if they deal with incidental circumstances of the contract, and said contract involves a good consideration, they shall be decided in favor of the smallest transmission of rights and interest. Should the contract involve a valuable consideration, the doubt shall be decided in favor of the greatest reciprocity of interests.

"Should the doubts, the decision of which is referred to in this section, involve the principal object of the contract so that the intention or will of the contracting parties can not be ascertained, the contract shall be void."—Civil Code, 1930, § 1241.

410

Since we reach the conclusion that the provision in question is not void, as we shall presently see, and in view of the fact that the complaint was predicated on the failure to comply with art. XI(f) and not with art. V of the agreement, it is not proper to make any decision on the basis of the situation we have just described.

 In our opinion, the terms of clause XI(f) of the agreement are clear and leave no room for doubt as to the intention of the contracting parties, and, therefore, the literal sense of the provisions thereof must be observed, as provided by § 1233 of the existing Civil Code, 31 L.P.R.A. § 3471.[6] In the first place, the clause in question provides that before using *any* machinery to cut cane in *ordinary operations*, the terms and conditions must be stipulated between the Unión and the employer with respect to the use thereof. There is no dispute on this point. However, the clause further provides that the foregoing provision does not apply to the operation of the machinery for cutting cane for experimental purposes. Hence, when such machinery is used for experimental purposes there is no obligation to arbitrate the use thereof. The possible question as to what constitutes an experimental use was anticipated so as to avoid disputes between the parties, in including in the clause a final provision which defines experimental use, namely, that *"during the grinding season the daily average of cane cut shall not exceed one hundred (100) tons."* (Italics ours.) The term "grinding season" means the duration of the sugar-cane crop, namely, the number of days such operation shall last in each year of the industry. Hence, the phrase "during the grinding season"

---

[6] This provision reads as follows:

"Section 3471. Literal sense to be observed; when intention prevails

"If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.

"If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail."—Civil Code, 1930, § 1233.

fixes the total number of days covered by the definition. The word "average" means mean term, so that in this case the mean term is 100 tons. The unit agreed upon with respect to such mean term is the day. Thus, such final provision clearly means that the cane cut by that machine, the use of which may be considered as experimental for the number of days the season shall last, may not exceed a mean term of 100 tons a day. The use of the word "any" in referring to the cutting machine in the first part of the clause under consideration excludes the interpretation that the provision refers to a particular machine. Nor is it proper to place the interpretation that the use of the apparatus is limited strictly to experimental use, as this phrase employed in scientific activities is currently understood, since the clause clearly defines what is meant by "experimental use." And, lastly, the 100-ton limitation can not be interpreted either as applicable to each working day. Such interpretation fails to take into consideration and to attach significance to the term "average" and it is therefore repugnant to and inconsistent with the clear terms of the definition of "experimental use" employed in the clause in question. We therefore believe that the said clause should not have been declared null and void pursuant to § 1241 of the Civil Code, but, on the contrary, that it is valid and effective and the literal sense thereof must be observed, as provided by § 1233 of that Code.

The fact that in an arbitration subsequent to the execution of the agreement for the purpose of putting an end to a strike situation it was agreed "to clarify the interpretation of subd. (f) of art. XI," far from constituting "clear and conclusive evidence as to absence of the common intention of the parties," could only be indicative of an attempt to make more understandable that which is clear in itself and of the evident desire of the parties, considering the circumstances that the continuation of the stoppage would be disastrous for both parties, to come to an agreement, one party consenting to arbitrate a subsequent clarification of the provision in

return for being able to use the machine for cutting cane whenever the Uniones fail to furnish a certain number of workers a day. The decisions of this Court support this conclusion.

In *Solá* v. *Orcasitas*, 11 P.R.R. 78 (1906), the question involved was the sale with right to repurchase a house in which the owner obligated himself in writing "to give notice to Orcasitas at the beginning of the fifth year whether or not he intends to recover the estate upon the expiration of the sixth year—that is to say, one year before the date fixed for the redemption—without which notice from such date the redemption condition shall remain." The notice in question was given six days after the expiration of the year preceding the expiration of the six years. Plaintiff, the owner of the property, alleged that the words of that stipulation were absolutely opposed to the intention which defendant affirmed to be the intention of the contracting parties. He further alleged that the clause was so obscure and doubtful that it was not possible to determine the intention of the parties as to the term agreed upon for giving notice. This Court held, on the contrary, that notwithstanding the errors in the clause which are errors of words rather than of concept, the true intention of the contracting parties is shown by a reading of the clause itself, and ruled that §§ 1233 and 1234 of the Civil Code and not § 1241 of the Code *supra* are applicable to the case. *Heirs of Ramírez de Arellano, etc.* v. *Super. Court; Del Moral, Int.*, 81 P.R.R. 347 (1959); *Caballero* v. *Kogan*, 73 P.R.R. 617 (1952); *National City Bank of N. Y.* v. *Martínez*, 41 P.R.R. 162 (1930); *Finlay* v. *Finlay Brothers & Waymouth Trading Co.*, 8 P.R.R. 371 (1905); VIII MANRESA, *Comentarios al Código Civil Español* 499–500 (5th ed. 1950).

The Board concluded that the obligation to arbitrate the interpretation and application of a collective bargaining agreement subsists even though the employer actually believes that he has not breached the collective agreement, and in sup-

port of its conclusion it cites, among others, the case of *Labor Board* v. *Sands Mfg. Co.*, 306 U.S. 332 (1939), in which the Supreme Court of the United States laid down the following doctrine:

"... But we assume that the Act imposes upon the employer the further obligation to meet and bargain with his employees' representatives respecting proposed changes of an existing contract and also to discuss with them its true interpretation, *if there is any doubt as to its meaning.*" (Italics ours.)

The obligation to bargain respecting the true interpretation of a contract, according to that doctrine, arises *if there is any doubt as to its meaning.* In the *Sands* case the Court held that the contract terms on seniority in the employment were not ambiguous. Neither are those involved in the case under consideration relative to the use of machinery for cutting sugar cane. In that case the Court observed that the employer bargained fully with the Union, notwithstanding the fact that the terms of the agreement object of dispute were clear. It is possible that the language is what gives occasion to cite the case in support of the contention that there is obligation to bargain, even though the terms of the agreement are clear.

In *National Labor Relations Bd.* v. *Newark Morning L. Co.*, 120 F.2d 262 (1941), there was involved a charge of unfair practice consisting in the discharge of an employee in violation of the terms of the agreement not to discharge or discriminate against any employee because of union membership. On reconsideration, the Court held that:

"The right of collective bargaining is, however, necessarily a continuing right. Collective agreements ordinarily, as in this case, run for definitely limited periods of time. Negotiations for their renewal must take place periodically and may commence, at least preliminarily, shortly after the signing of the preceding contract. Furthermore it may at any time become desirable or indeed necessary to bargain collectively for the modification of an existing collective agreement which has proved in practice to be in some respects unfair or unworkable

or for the adjustment of complaints or alleged violations of such an agreement. Collective bargaining is thus seen to be a continuing and developing process by which, as the law now recognizes, the relationship between employer and employee is to be molded and the terms and conditions of employment progressively modified along lines which are mutually satisfactory to all concerned. It is not a detached or isolated procedure which, once reflected in a written agreement, becomes a final and permanent result."

Obviously, in this case the court's statement that the law gives employee the right to bargain changes in an existing agreement if its terms are not susceptible of being put into practice or are unfair, is *obiter dictum* since the controversy in the case did not involve any change in an agreement, but to compel compliance with an obligation to bargain prescribed by law to protect the rights of organization which may be weakened by discriminatory discharges. Furthermore, in this case the clauses in question were susceptible of being put into practice, they were not unfair, but, on the contrary, they were aimed at settling disputes and providing the form and manner of obviating and avoiding them in the future by a clearer definition of the rights of the parties. 63 Harv. L. Rev. 1097 (1950).

In *Rapid Roller Co.* v. *National Labor Relations Board*, 126 F.2d 452 (1942), the employer maintained that the interpretation of the terms of an agreement is nonnegotiable. The court actually concluded that it could not say that the agreement was not free from doubt. The clause in dispute required that all applicants for employment shall be referred to the Shop Committee before going to work. The employer hired four new employees who commenced to work on a certain date. The Committee was not consulted before hiring them, but they were introduced to the Committee when they reported for work. The Union contended that there was a problem of transfer of employment by way of promotion and that those persons should have been referred to the Committee

before going to work, instead of hiring them and then bringing them up to the plant to introduce them to the committeemen. Obviously there arose a dispute as to the interpretation of the agreement requiring bargaining.

In *Timken Roller Bearing Co.* v. *National Labor Rel. Bd.*, 161 F.2d 949 (1947), the Union demanded that it be consulted on subcontracts. The practice during 25 years was that this was a management function with which the Union had not interfered. But it was not expressly included in the so-called management clause in which were set forth as exclusive functions of the company the right to hire, suspend, or discharge for cause, or to transfer or relieve from employment for shortage of work, provided such rights were not exercised for discriminatory purposes against any Union member. The court held that the practical construction put upon the management clause by both parties was that contracting was a function of management; however, the dispute, as it developed, was a dispute as to the interpretation of the management clause to be settled within the grievance procedures and, if they failed, by arbitration. Evidently the court distinguished between practical interpretation and the fact that the right to subcontract was not expressly included in the management clause and, therefore, it was reasonable to conclude that there was a negotiable dispute respecting the Union's demand for intervention in subcontracting.

In *Consolidated Aircraft Corp.* v. *National Labor Rel. Board, supra,* it was held that the Union's claim for double pay to the laborers of a third shift for the hours worked on Sunday comes within the clause of the agreement providing for arbitration of differences and disagreements, notwithstanding the fact that the contract provided for special pay for that shift. However, that clause neither included nor excluded such claim and it was therefore a negotiable controversy.

The case of *Carroll's Transfer Co.*, 56 N.L.R.B. 935 (1944), merely decides that a party can not modify

416

unilaterally an agreement, but by bargaining with the other. It does not decide that the obligation to negotiate such modifications arises at the time of requesting the latter.

 Although the collective bargaining agreement is used in a field of activity governed by special rules, which is different from those in which it is ordinarily contracted, and the purpose of which is also of another nature, it is not for that reason less than a contract and should therefore be governed by the provisions of the Civil Code, unless otherwise provided by law. See *Rivera* v. *Land Authority*, 83 P.R.R. 251 (1961). It is therefore the law between the parties. In the absence of special provisions therein or of circumstances warranting the same at law, neither party is obligated to negotiate with respect to provisions of an agreement which are undoubtedly clear, nor may the latter be modified or altered unilaterally, nor is any party to an agreement obligated to negotiate changes in the contents thereof at the request of the other party. Otherwise, the purpose of the Puerto Rico Labor Relations Act and the public policy stated therein would be defeated,[7] since in that event the agreement would fail to provide certainty, security, and continuity to the rights of the parties established by negotiation. On the contrary, it would be the source and reason for continuous disputes and conflicts between the parties. However, where an agreement contemplates negotiation of modification thereof, there is an obligation to do so. *Labor Board* v. *Lion Oil Co.*, 352 U.S. 282 (1957).

---

[7] The following principles are part of the public policy declared in that Act (29 L.P.R.A. § 62):

" .　　.　　.　　.　　.　　.　　.　　.　　.

"(2) Industrial peace, adequate and regular salaries for the employees, and uninterrupted production of goods and services by means of collective bargaining, are essential factors for the economic development of Puerto Rico. The achievement of these objectives depends to a large extent upon fair, friendly and mutually satisfactory relations between employers and employees, and upon the availability of adequate means for the peaceful solution of employer-employee controversies.

■ We therefore hold that since clause XI(f) of the agreement in question is crystal clear, there was no obligation at law to negotiate respecting its contents, scope, or meaning, and, therefore, the refusal to do so was not an unfair labor practice under § 8(1) (d) of the Puerto Rico Labor Relations Act.

■ It is alleged that the use of the machine for cutting cane and petitioner's refusal to negotiate the use thereof resulted in a work stoppage. Petitioner assigns this determination as the fifth error. It alleges that the stoppage was in violation of a no-strike clause of the agreement [8] and that, therefore, petitioner was not obligated to negotiate the use of that machine after the stoppage. The Board held that the strike was the result of the employer's unlawful refusal to negotiate the interpretation and application of the agreement and that the no-strike clause of the agreement does not contain an express waiver of such right whenever the employer engages in unfair labor practices. Petitioner is right, inasmuch as the stoppage was not the result of and in protest against petitioner's unfair labor practice involving the use

---

"(3) By means of collective bargaining, terms and conditions of employment are to be established. For the purposes of such bargaining employers and employees shall have the right of forming organizations of their own choosing.

" . . . . . . . . . . .

"(5) All existing collective bargaining contracts, as well as those hereafter executed, are hereby declared to be instruments for the promotion of the public policy of the Government of Puerto Rico in its efforts to develop production to the maximum; and it is declared that as such they are vested with a public interest. The exercise of the rights and the performance of the obligations by the parties to such collective bargaining contracts are therefore subject to such reasonable regulations as may be necessary to effectuate the public policies of this subchapter."

[8] "Article IX. Strike and Lockout.—During the life of this collective bargaining agreement the UNION and its affiliated unions shall not resort to strike nor to work stoppage with detriment to the interests of the EMPLOYER, nor shall the EMPLOYER resort to lockout against the workers, and any dispute shall be submitted to the Local Complaints and Grievances Committee as provided hereinabove. Any decision shall be made as stipulated in the said Article."

of the machine for cutting cane nor against its justified refusal to negotiate such use. The case of *Mastro Plastics Corp.* v. *Labor Board*, 350 U.S. 270 (1956), is not in point since it involved a strike precipitated by an unfair labor practice of the employer. That is not the case before us. Nor is the Board's contention supported by the case of *Dorsey Trailers, Inc.*, 80 N.L.R.B. 478 (1948), which involved a lockout by the employer in reprisal for an unjustified work stoppage in protest against the layoff of a union member. *The contract did not contain a no-strike clause.* The National Board held that the lockout was discriminatory and in violation of law, *since the right to strike had not been waived by agreement and it can not be waived by implication* as, for example, in accepting a clause to settle all disputes within the complaints and grievances procedure.

 The second ground in support of the determination that petitioner refused to bargain collectively consisted in that, when dispute on the changes in working hours arose, petitioner refused to submit the same to arbitration and that on other occasions it refused to meet for the purpose of discussing the same despite the demands made by the president of one of the unions, both by word of mouth and by letters and telegrams. The matter was taken up twice in the Complaints and Grievances Committee without the parties reaching an agreement. Petitioner alleged that clause IV of the agreement conferred an indubitable and clear right to make changes in the working hours whenever warranted by some force beyond the control of the parties, *such as* interruptions in the grinding or traffic as a result of machine breakage. Petitioner alleged that every change of hours was due to force majeure, pointing out as such the shortage of wagons at the different switches (*chuchos*) where the cane was to be loaded, motivated by the fact that in the morning the wagons were loaded with cane, especially on Saturday, at the Central's loading station. Although this ground is not specifically included among the causes of force majeure enumerated in said clause IV, the

Board concluded that there had been a cause of force majeure to warrant the shift changes, but that such unfair labor practice had been committed. On the face of art. IV of the agreement it is evident that petitioner lacked full discretion to change the working hours. It could do so only for the cause stipulated in that provision. A change of hours having been made and the Union having challenged the existence of justification for such change, the parties were obligated to settle the complaint in pursuance of clause V of the agreement, namely, by the Complaints and Grievances Committee or by arbitration or by the proper agencies. *Drake Bakeries* v. *Bakery Workers, supra.* In refusing to arbitrate the question, petitioner possibly engaged in an unfair labor practice by violating clause V of the agreement, pursuant to § 8(1) (*f*) of the Labor Relations Act. This question is not before us, since no complaint was filed against petitioner for violation of clause V of the agreement providing for arbitration, in refusing to comply therewith. Regarding this question, it remains for us to decide whether the refusal to submit the dispute to arbitration constitutes an unfair labor practice under § 8(1) (*d*) of the Labor Relations Act.

In the case of *United Telephone Company of the West and United Utilities, Incorporated, and International Brotherhood of Electrical Workers, Local No. 843, AFL,* 112 N.L.R.B. 779 (1955), pursuant to an agreement providing for a 40-hour week of five 8-hour days and payment of time and a half for work performed in excess of such limits, the employer reduced the working period in a department to the limit established by the agreement. During the past 7 or 8 years such period had consisted of 48 hours a week. The Union claimed that the change violated the clause of the agreement requiring that the privileges and benefits heretofore in effect which had not been mentioned or changed by the agreement would remain unchanged, except with the parties' consent. The dispute having been fully discussed by the parties and, upon failure to reach an agreement, the Union proposed that

it be submitted to arbitration under the arbitration clause of the contract. The employer suggested filing a suit for declaratory judgment and filed such a suit. The Union filed a complaint alleging that the refusal to arbitrate was an unfair labor practice under the provisions of § 8(a)(5) of the Taft-Hartley Act [9] (which is identical with § 8(1)(d) of the Puerto Rico Labor Relations Act). The National Board held that the refusal to arbitrate the dispute was not in itself a violation of the Taft-Hartley Act, and that the Board is not the proper forum to remedy a breach of contract or to obtain specific performance thereof.[10] See, also, *McDowell Aircraft Corporation*, 109 N.L.R.B. 930 (1954); *Textron Puerto Rico (Tricot Division)*, 107 N.L.R.B. 583 (1953).

It is our opinion, therefore, that petitioner did not engage either in an unfair practice under the said par. (d) in refusing to arbitrate the change of hours in question.

We need not consider the fourth [11] error assigned by petitioner. We have already held that the refusal to arbitrate in this case does not constitute the unfair labor practice imputed to petitioner by the Board under par. (d) *supra*. The case is adequately disposed of on other grounds previously stated in this opinion.

Summing up, we conclude that petitioner not having engaged in the unfair labor practice object of the order of the Board in this case, such order is set aside and the Board's petition to enforce the same is accordingly denied.

[9] National Labor Management Relations Act, 1947, 61 Stat. 136, 29 U.S.C.A. § 141.

[10] Under the local law, the violation of an agreement constitutes an unfair practice and the State Board is the proper forum to settle the question. See *P. R. Telephone Co.* v. *Labor Relations Board*, 86 P.R.R. 362.

[11] The fourth error reads as follows:

"4. The Board committed gross error in violation of the due process of the Constitution of the Commonwealth of Puerto Rico in resting its decision and order on the refusal of Luce & Co. to accept as arbitrator Judge Miguel Velázquez Rivera, who was proposed by the Chairman of the Board, whose function is also to pass upon the cases submitted to that agency."