330 F.2d 492
 PHILADELPHIA MARINE TRADE ASSOCIATION and Its Members, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Local 1291, ILA, Intervenor.
Local 1332, ILA, Intervenor.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION LOCALS 1291, 1332, 1566 AND 1242, Petitioners,
Local 1332, ILA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Philadelphia Marine Trade Association and Its Members, Intervenors.
 No. 14225.
 No. 14257.
 United States Court of Appeals Third Circuit.
 Argued November 4, 1963.
 Decided April 6, 1964.
 
 Robert G. Kelly, Philadelphia, Pa. (Kelly, Deasey & Scanlan, Philadelphia, Pa., on the brief), for Philadelphia Marine Trade Assn.
 Abraham E. Freedman, Philadelphia, Pa. (Martin J. Vigderman, Wilfred F. Lorry, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for petitioners.
 Elliott Moore, NLRB, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, on the brief), for National Labor Relations Board.
 Lisbon U. Tillman, Philadelphia, Pa. (John Stuart Carnes, Philadelphia, Pa., on the brief), for Intervenor Local 1332, International Longshoremen's Union.
 Before STALEY, HASTIE and SMITH, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 The National Labor Relations Board has found that the employer-members of the Philadelphia Marine Trade Association ("PMTA") violated § 8(a) (3) and (1) of the National Labor Relations Act.[1] More specifically, the Board determined that these employers wrongfully locked out all of the longshoremen employed by them in the Port of Philadelphia because certain of those longshoremen properly refused to work under conditions found to be unsafe. 138 N.L.R.B. 737 (1962). The case is here on petitions for review filed by the PMTA and by the International Longshoremen's Association, Locals 1291, 1332, 1566, and 1242. The Board has requested enforcement of its order in its answer to the petition of the PMTA. The PMTA asserts that the Board's determination is unwarranted, while the union contends that the Board should have found additional violations and that its back pay award is inadequate.
 
 
 2
 The dispute which gave rise to the instant proceeding was based upon the insistence by one of the employer-members of the PMTA, Atlantic and Gulf Stevedores, Inc., that the longshoremen employed by it use wooden pallets instead of slings to unload a cargo of sugar on the S.S. Caribe. Perhaps the most concise statement of the factual circumstances attending this controversy is contained in the following excerpt from the decision of the Board:
 
 
 3
 "As the Trial Examiner found, on June 30, 1959, some 90 A & G employees, longshoremen members of Local 1291, reported to the S.S. Caribe to unload a full cargo of bagged sugar. Upon arrival, they learned that they were to unload the bags with the use of pallets rather than slings. They notified their union representatives that they would not unload with pallets as they considered such an operation unsafe. The representatives communicated the longshoremen's decision to Emery, the pier supervisor of A & G, and a compromise proposal was offered by Emery whereby the longshoremen would unload the ship with slings and then use pallets for rehandling the bags on the dock. By the time Local 1291 accepted, however, the proposal was abruptly withdrawn by William Toner, District Manager of A & G, who made his appearance while the Union representatives were conferring among themselves. The longshoremen then left the ship, and worked neither that day nor the following day, July 1. After several conferences between officials of ILA, A & G, and PMTA, an employers' association of which A & G was a member, an agreement was reached between Toner and J. T. Moock, a vice-president of ILA, whereby the men would start unloading with pallets and a changeover to slings would be made shortly thereafter.
 
 
 4
 "At 8 a. m. on July 2, the A & G longshoremen began unloading with the use of pallets. It is clear, as the Trial Examiner found, that bags of sugar fell from the pallets during the unloading operation. And Toner admitted that even one falling bag was dangerous. When a shift to slings was not made by A & G during the morning despite the complaints of the longshoremen, they refused to return to work after lunch. The Respondents thereupon advised ILA by telegram that unless the A & G longshoremen resumed work on the Caribe at 8 a. m. on July 3, all longshoremen represented by Local 1291 would be locked out throughout the entire Port of Philadelphia commencing July 6. At 8 a. m. on July 3, however, A & G still had not shifted to slings, and the Caribe longshoremen accordingly continued to refuse to work. At noon all the other longshoremen members of Local 1291 in the Port of Philadelphia area stopped work to meet at the union hall for a discussion of the lockout threatened by the Respondents. They were directed by ILA officials to report for work as usual on July 6. When they did, however, the Respondents carried out their threat and locked them out. Moreover, the Respondents insisted that the lockout would not be lifted until the A & G longshoremen resumed work under the unsafe conditions which had caused them to cease work in the first place. The Respondent further refused to consider the safety question under the grievance and arbitration provisions of the contract until the longshoremen resumed work on the Caribe. On July 21, however, the Respondents finally receded from their position, agreed to end the lockout, and likewise agreed to arbitrate the safety question. On the following day, the arbitrator observed the operation of unloading the bagged sugar from the Caribe with the use of pallets, and found it to be an unsafe operation. Thereupon, A & G substituted slings, and the A & G longshoremen completed their work of unloading the Caribe, without further incident."
 
 
 5
 The Board held that, as the longshoremen's refusal to work resulted from an abnormally dangerous condition of work, this refusal did not constitute a strike under § 502 of the Act,[2] even assuming the existence of a no-strike contract. Accordingly, this quitting of labor was held to be protected by the Act, and the lockout was found to be in violation of § 8(a) (3) and (1). Back pay was awarded to all longshoremen, including those who had refused to work on the S.S. Caribe, from the date of the lockout on July 6, 1959, until July 22, 1959. However, the Board, reversing the trial examiner, concluded that, in the circumstances of this case, the employers did not discriminate against the members of sister unions who did not work during the period of the lockout and who were normally employed as maintenance men, timekeepers, checkers, or carloaders in the Port of Philadelphia.
 
 
 6
 The PMTA does not seriously challenge the Board's finding that the work stoppage was caused by an abnormally dangerous condition of work. See National Labor Relations Board v. Knight Morley Corp., 251 F.2d 753 (C.A. 6, 1957), cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1958). The Association argues, however, that the lockout was justified because its purpose was to compel the union to abandon a "quickie strike," and to compel the submission of the dispute to arbitration. The short answer to this is that because the union's activity was found to come within the ambit of § 502, it was not a strike in violation of the contract but, on the contrary, was protected activity. In these circumstances, the Board properly concluded that the lockout by the PMTA in an attempt to compel the longshoremen to abandon this protected activity gave rise to a violation of § 8(a) (3) and (1). See, Utah Plumbing and Heating Contractors Assn. v. National Labor Relations Board, 294 F.2d 165 (C.A.10, 1961); Quaker State Oil Refining Corp. v. National Labor Relations Board, 270 F.2d 40 (C.A.3), cert. denied, 361 U.S. 917, 80 S.Ct. 261, 4 L.Ed.2d 185 (1959); National Labor Relations Board v. Knight Morley Corp., supra (discharge for refusal to work under abnormally dangerous conditions). Moreover, the Board, based upon substantial evidence, found that it was the PMTA and not the union which delayed arbitration by its insistence that the employees continue to work pending a resolution of the issue. Thus, to the extent that the challenge of the PMTA to the finding of an unfair labor practice constitutes an attack upon the Board's findings of fact, including both the inferences it drew from the evidence presented as well as its resolution of issues of credibility, we have repeatedly stated that such factual determinations will not be disturbed by this court unless not supported by substantial evidence in the record as a whole. National Labor Relations Board v. Chas. S. Wood & Co., 309 F.2d 140 (C.A.3, 1962); National Labor Relations Board v. Buitoni Foods Corp., 298 F.2d 169 (C.A.3, 1962); Quaker State Oil Refining Corp. v. National Labor Relations Board, supra. Here the findings of the Board are amply supported by the evidence.[3]
 
 
 7
 The reliance by the PMTA upon the decision in National Labor Relations Board v. Truck Drivers' Local Union No. 449 etc., 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957), as justification for the lockout is misplaced. The Supreme Court there held that a lockout by an association of employers is not unlawful when used as a defense to a union's "whipsawing" strike tactic which threatens the destruction of the employers' interest in bargaining on a group basis. See also New York Mailers' Union Number Six, International Typographical Union, A.F.L.-C.I.O. v. National Labor Relations Board, 327 F.2d 292 (C.A.2, 1964). Here the lockout was a countermeasure not to a strike, but to a refusal to work under abnormally dangerous conditions. Nor was this conduct of the longshoremen a threat to bargaining on a group basis.
 
 
 8
 Local 1332 of the International Longshoremen's Association has been granted leave to intervene in each of these petitions for review. Both it and the other union parties to this proceeding vigorously attack the failure of the Board to find a violation with respect to employees other than longshoremen who were affected by the lockout. Because of its significance, we quote the holding of the Board on this score:
 
 
 9
 "We do not agree, however, with the Trial Examiner's further conclusion that the lockout of the longshoremen also constituted unlawful discrimination against members of sister locals normally employed by Respondents as maintenance men or timekeepers or checkers or carloaders. The complaint does not allege that members of these sister locals (specifically, Locals 1332, 1566 and 1242) were also locked out by Respondents, nor does the evidence adduced at the hearing lead us to this conclusion. Accordingly, we find, in the circumstances of this case, that the Respondents did not discriminate against the other categories of employees represented by Locals 1332, 1566, and 1242."
 
 
 10
 The unions argue that this holding constitutes an unwarranted reversal by the Board of the factual finding of the trial examiner that these employees were deprived of an opportunity to work by the lockout. Further, the unions contend that the Board was compelled to find a violation as to these employees because their work "was interrelated with and wholly dependent upon the work performed by [the longshoremen]."
 
 
 11
 The Board concedes that these employees lost work as a consequence of the lockout. It urges that its reversal of the trial examiner on this point was not based on a contrary view of the facts, but upon its view of the legal effect of the facts he found. More particularly, the Board contends that the loss of work by employees other than longshoremen did not result from any discriminatory action by the PMTA against them, but was simply an incidental consequence of the discriminatory action taken against the longshoremen.
 
 
 12
 We think that the Board's reversal of the trial examiner was based on an issue of law rather than a question of fact. Though at first glance the language in its decision appears to indicate a different view of the evidence, actually the Board was reversing the trial examiner's legal conclusion that "the lockout of Local 1291 members resulted in equally unlawful discrimination against members of sister locals, since much of their employment depended upon longshoremen being employed."
 
 
 13
 It is not controverted that the PMTA had no dispute with the members of the sister locals; its dispute was with the longshoremen because of their refusal to work under conditions found to be dangerous. To put the matter another way, there is no evidence of any discriminatory motivation toward employees other than longshoremen. As the Board aptly observes in its brief, the consequential injury to the other workers "occurred because of the nature of their work, not by virtue of their membership in any union." In the absence of any evidence of discriminatory intent, the employers' action was not unlawful as to these employees, unless it was "inherently discriminatory." National Labor Relations Board v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). We have already stated that the record does not reveal an intent to discriminate against the members of the sister locals, and we cannot say that the lockout was inherently discriminatory as to them in the circumstances of this case. In sum, the conduct of the employers was directed against the longshoremen, and only incidentally did it affect the other workers in the Port of Philadelphia.
 
 
 14
 Our recent decision in National Labor Relations Board v. Local 825, International Union of Operating Engineers, A.F.L.-C.I.O., 326 F.2d 218 (C.A.3, 1964), supports our conclusion on this point. We there ruled that union conduct which only incidentally affects a neutral employer cannot be held to violate the secondary boycott provisions of the Act.
 
 
 15
 Local 1291 asserts that the back pay award to the longshoremen who refused to work on the S.S. Caribe should run from the date of their refusal to work rather than from the date of the lockout. The Board contends that the award is proper since the unfair labor practice did not occur until the PMTA instituted the lockout. We think that the rationale of the Board is sound, for though the longshoremen were protected by the statute in refusing to work under abnormally dangerous conditions, no unfair labor practice arose until they were locked out by their employer. In any event, we cannot say that the Board abused the broad discretion vested in it to fashion remedial back pay orders to effectuate the policies of the Act.
 
 
 16
 The order of the Board will be enforced. A form of decree may be submitted.
 
 
 
 Notes:
 
 
 [1]
 "§ 158. Unfair labor practices
 "(a) It shall be an unfair labor practice for an employer —
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 * * * * *
 "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." 29 U.S.C.A. § 158(a) (1) and (3).
 
 
 [2]
 "§ 143. Saving provisions
 "Nothing in this chapter shall be construed to require an individual employee to render labor or service without his consent, * * * nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this chapter." 29 U.S.C.A. § 143.
 
 
 [3]
 The same observations apply to the contention that the employers were not informed that the quitting of labor resulted from abnormally dangerous conditions of work, and that they were not given a reasonable opportunity to correct these conditions