466 F.2d 1157
 80 L.R.R.M. (BNA) 3153, 68 Lab.Cas. P 12,893,
1971-1973 O.S.H.D. ( 15,119
 GATEWAY COAL COMPANY,
v.
UNITED MINE WORKERS OF AMERICA, Appellant in No. 71-1641, et al.
Appeal of DISTRICT NO. 4, UNITED MINE WORKERS OF AMERICA, in
No. 71-1642.
Appeal of LOCAL NO. 6330, UNITED MINE WORKERS OF AMERICA, in
 No. 71-1786.
 Nos. 71-1641, 71-1642 and 71-1786.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 7, 1972.
Decided July 18, 1972.
 
 Melvin P. Stein, Kuhn, Engle & Blair, Pittsburgh, Pa., and Joseph A. Yablonski, Washington, D.C., for appellants.
 Leonard I. Scheinholtz, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee.
 Before KALODNER, HASTIE and MAX ROSENN, Circuit Judges.OPINION OF THE COURT
 HASTIE, Circuit Judge.
 
 
 1
 This is an appeal from an order, entered after hearing, that stated merely that a preceding temporary restraining order "shall now constitute a preliminary injunction without change until further order of this Court."
 
 
 2
 The underlying cause of controversy was the failure of three assistant foremen at a large underground coal mine to carry out certain prescribed mine safety procedures on a particular occasion and the consequent refusal of the miners to work so long as those supervisors should be employed. The miners also rejected a proposal to submit the matter to binding arbitration.
 
 
 3
 In its complaint the mine owner, Gateway Coal Co., invoked the jurisdiction of the district court under section 301 of the Labor-Management Relations Act, 29 U.S.C. Sec. 185, and asked the court to order binding arbitration of the controversy and also to restrain the union from striking to enforce its demands for the removal of the foremen. In its temporary restraining order, later converted into a preliminary injunction, the court ordered that the dispute be submitted to an impartial umpire for binding decision, that the controversial mine foremen be suspended pending the umpire's decision and that the employees not strike to enforce their demands for the removal of these supervisors.
 
 
 4
 During the pendency of this appeal the impartial umpire rendered his decision in which he determined that the assistant foremen should be permitted to return to work. Accordingly, two of those foremen have resumed their duties as supervisory employees responsible for mine safety procedures. Thus, in its present and continuing effect the injunction from which this appeal has been taken compels miners to accept an arbitrator's decision that their safety is not significantly jeopardized by risks inherent in working under certain foremen whose handling of safety procedures they distrust and prohibits them from refusing to work despite their own apprehension of danger.
 
 
 5
 In greater detail, the undisputed facts are these. On April 15, 1971, shortly after the daylight shift began work in the mine, it was discovered that the flow of air through a work area was 11,000 cubic feet per minute as contrasted with a normal 28,000 cubic feet. This increased the danger of the accumulation of dust and flammable gas and the risk of consequent explosion. Subsequent investigation disclosed a partial blockage of an intake airway. This was corrected promptly and normal air flow was restored.
 
 
 6
 On April 16 and 17, pursuant to a request by the union, federal and state inspectors visited the mine and investigated the circumstances of the April 15 incident and the adequacy of the consequent repair work. In the course of this investigation it was discovered that three assistant mine foremen, whose duty it was to check and record air flow before the daylight shift began work, had made false entries in their log books that failed to disclose the true air flow at the time in question.
 
 
 7
 On Sunday, April 18, some 200 Gateway employees attended a special union meeting and unanimously voted not to work under the assistant foremen in question. The next day the foremen were suspended by management. Criminal proceedings also were instituted against them for falsifying mine records.
 
 
 8
 Late in May, the Pennsylvania Department of Mines notified Gateway that it did not object to the reinstatement of the suspended foremen, though criminal proceedings against them were still pending. On June 1, Gateway reinstated two of the foremen. The third had elected to retire.
 
 
 9
 When the foremen returned to work on June 1, the union employees left the job. This work stoppage continued while Gateway offered to arbitrate the dispute. The union refused to arbitrate. Gateway then filed the present suit and obtained the now challenged order that terminated the work stoppage and compelled arbitration of the dispute.
 
 
 10
 Subsequently the arbitrator found that the dispute was arbitrable, that the contention of the miners that the retention of the foremen with safety responsibilities would be dangerous was without merit and that the foremen should be allowed to perform their assigned tasks without interference.
 
 
 11
 There is no finding, indeed no basis for a finding in this record, that the miners did not honestly believe that their lives were unduly endangered so long as the foremen in question were responsible for safety procedures. The foremen had been guilty of significant dereliction. Indeed, they pleaded nolo contendere to a charge of criminal violation of safety requirements and were fined $200 each. And there had been a few earlier complaints concerning their handling of matters involving safety.
 
 
 12
 The employer reasons that the present dispute was arbitrable under the terms of the collective bargaining agreement of the parties and, therefore, that a strike that repudiates the agreed settlement procedure and attempts to compel acceptance of the union's demands is an enjoinable violation of the labor contract, even in the absence of a no-strike agreement, as held by the Supreme Court in Teamsters Local 174 v. Lucas Flour Co., 1962, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593.
 
 
 13
 The applicable National Bituminous Coal Wage Agreement of 1968 contains a section on "Settlement of Local and District Disputes." That section provides that "should any local trouble of any kind arise at the mine" an attempt shall be made to settle it by local negotiation and, if necessary, by a board composed of two representatives of the union and two representatives of management. Should these procedures fail, the dispute is to be referred to an impartial umpire and the "decision of the umpire shall be final." The mineowner relies upon this provision.
 
 
 14
 The union argues that this general section on local disputes was not intended to control employee response to or rejection of hazardous working conditions. It is pointed out that another part of the labor contract specifically provides that, regardless of the views or judgment of the operator, a mine must be closed if the mine safety committee of the local union finds it immediately dangerous. And in this case a union membership meeting, the body superior of the mine safety committee, unanimously voted to stay out of the mine because of a particular hazard. Moreover, witnesses, both for the union and for the employer, testified at the hearing in this case that they did not know of any case in which a disagreement on a safety matter had been handled through arbitration.
 
 
 15
 Thus, it is neither particularly stated nor unambiguously agreed in the labor contract that the parties shall submit mine safety disputes to binding arbitration, and the practice of the parties has been to the contrary.
 
 
 16
 We recognize that in interpreting and applying labor contracts there is a strong federal policy in favor of arbitration as a method of settling the ordinary type of labor dispute concerning wages, hours, seniority, vacations and other economic matters. United Steel- workers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; Radio Corporation of America v. Association of Professional Engineering Personnel, 3d Cir. 1961, 291 F.2d 105. However, a dispute concerning the safety of the place and circumstances in which employees are required to work is sui generis. The present case exemplifies the special and distinguishing character of safety disputes. Underground mining is a hazardous occupation at best. Necessarily, men who risk their lives daily in the course of this occupation are acutely concerned that every reasonable precaution be taken at all times to prevent a catastrophic accident. Any failure of responsible supervisors to perform their assigned duty to check air flow in a mine and to record and immediately report any significant diminution can cause the death of many men. In such circumstances, a single negligent failure to take a required safety precaution may reasonably be viewed as intolerable by those whose lives are at stake.
 
 
 17
 Considerations of economic peace that favor arbitration of ordinary disputes have little weight here. Men are not wont to submit matters of life or death to arbitration and no enlightened society encourages, much less requires, them to do so. If employees believe that correctible circumstances are unnecessarily adding to the normal dangers of their hazardous employment, there is no sound reason for requiring them to subordinate their judgment to that of an arbitrator, however impartial he may be. The arbitrator is not staking his life on his impartial decision. It should not be the policy of the law to force the employees to stake theirs on his judgment.
 
 
 18
 This view of public policy is strongly supported by specific legislation. Section 301 of the Labor-Management Relations Act, 29 U.S.C. Sec. 185, under which this suit was brought, and section 502 are in pari materia, both being part of the same chapter in the 1947 enactment. Section 301 gives the district courts jurisdiction over "suits for violation of [labor] contracts" covered by "this chapter." In relevant part, section 502 provides: "nor shall the quitting of labor by . . . employees in good faith because of abnormally dangerous conditions for work at . . . [their] place of employment . . . be deemed a strike under this chapter." 29 U.S.C. Sec. 143.
 
 
 19
 In applying section 502, this court has held that a refusal to work because of good faith apprehension of physical danger is protected activity and not enjoinable, even where the employees have subscribed to a comprehensive no-strike clause in their labor contract. Philadelphia Marine Trade Association v. N. L. R. B., 3d Cir. 1964, 330 F.2d 492, cert. denied International Longshoremen's Ass'n v. N. L. R. B., 379 U.S. 833 and 841, 85 S.Ct. 65, 13 L.Ed.2d 41. Accord, N. L. R. B. v. Knight Morley Corp., 6th Cir. 1957, 251 F.2d 753, cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370.
 
 
 20
 Actually, a duty to accept the procedure of binding arbitration and a duty not to strike are opposite sides of a single coin. Therefore, the strong and explicit legislative mandate that protects work stoppages caused by good faith concern for safety should influence a court to reject any avoidable construction of a labor contract as requiring final disposition of safety disputes by arbitration.
 
 
 21
 For these reasons the present contract should not be construed as providing for compulsory arbitration of safety disputes.[1] Accordingly, in this case neither the miners' refusal to work nor their refusal to arbitrate the safety dispute was a violation of their labor contract. There was no wrong to enjoin. Yet, the preliminary injunction from which this appeal has been taken even now has the continuing effect of requiring the miners to accept the arbitrator's resolution of the safety dispute and to refrain from any work stoppage even if they still honestly believe that working under the controversial foremen subjects them to unacceptable danger. The miners should be relieved of this compulsion.
 
 
 22
 We have not overlooked an argument that the concept of a safety dispute and any special privilege or protection accorded employees in such a matter should be restricted to disputes concerning the physical conditions under which employees are required to work. However, we reject that suggested limitation. Careless or incompetent administration of important safety precautions can add as much to the hazards of dangerous employment as can the physical condition of the work place itself. And the normal concern of employees about danger from the one source is not essentially different from concern about the other. We are satisfied that any special freedom of action that should be accorded to employees in connection with safety disputes in general is fully applicable to the present controversy.
 
 
 23
 The judgment will be reversed and the cause remanded for a vacating of the preliminary injunction.
 
 
 24
 MAX ROSENN, Circuit Judge (dissenting).
 
 
 25
 I respectfully dissent.
 
 
 26
 Without attempting to analyze the motivations for the strike offered by the company, I believe that it is significant that the safety issue was not raised until after the union went on strike over the company's refusal to pay the men who failed to work on April 15th.
 
 
 27
 In addition, I have other serious reservations about the argument that the June continuance of the strike was because of the safety issue. If working with the two assistant foremen who were on the third shift was the genuine concern of the union, what explanation can be offered for the unilateral action of the union in calling off all men employed in the mine? Men were called off who were not working on the same shift with the two assistant foremen. Others who were employed on the surface also struck.
 
 
 28
 The union contended that the presence of the two assistant foremen in the mine constituted a safety hazard because they had committed isolated violations of mine safety regulations in the past. However, the record is to the contrary. First, the union had never complained about the alleged past violations, and the assistant foremen had continued in their jobs without objection from the union. Second, the union president was notified by the Pennsylvania Department of Environmental Resources, which exercises jurisdiction over coal mines, that:
 
 
 29
 In view of the satisfactory record and good performance of these foreman [sic] in the past and the pending legal action, we feel that no further action should be taken in this matter. The coal company is at liberty to return the three (3) assistant foreman [sic] to work if it so desires.[1]
 
 
 30
 The only blot on their records was the April incident which the Commonwealth authorities did not believe warranted lifting of their licenses or precluding them from work. In view of the investigation conducted by the Commonwealth, its findings, which are expert and impartial, are of the utmost importance.
 
 
 31
 Whatever the probative weight of the evidence the union presented, the majority constructs a test to evaluate the existence of safety hazards which is totally at odds with the commands of both Section 502 and the national policy in favor of arbitration. Although it recognizes that in interpreting and applying labor contracts there is a strong federal policy in favor of arbitration, it considers "a dispute concerning the safety of the place and circumstances in which employees are required to work [as] sui generis." It would seem to conclude that if a union honestly believes a safety issue exists, it has satisfied its burden under Section 502. Under this view, what criteria shall be used to measure union belief, especially when it concerns an assessment of the skill and integrity of a supervisory employee? I believe that when a union raises Section 502 as a justification for a work stoppage, particularly in situations involving the subjective assessment we have here, the union must present ascertainable, objective evidence supporting its conclusion that an abnormally dangerous condition for work exists. See, e.g., Philadelphia Marine Trade Association v. NLRB, 330 F.2d 492 (3d Cir. 1964) (use of slings instead of pallets to unload ship); NLRB v. Knight Morley Corp., 251 F.2d 753 (6th Cir. 1957), cert. denied, 357 U. S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1958) (broken fan blower). Acceptance of anything less by a court would be an abdication of its judicial role.
 
 
 32
 But this result may be what the majority opinion portends. Its new test is that "[i]f employees believe that correctible circumstances are unnecessarily adding to the normal dangers of their hazardous employment . . .", they need not arbitrate. This test will require a court to accept the naked assertion of an employee that the presence of one of his fellow employees in a plant constitutes a safety hazard. If employees may label another employee a working risk and thereupon engage in a work stoppage which, because of its characterization as a safety strike, is unreviewable by arbitration or court, no employer can expect stability in labor relations. Moreover, each employee is the possible victim of the attitudes, fancies and whims of his fellow employees. Unions, themselves, will be at the mercy of "wildcatters." In my opinion, such a rule not only runs directly counter to our national policy of promoting labor stability but opens new and hazardous avenues in labor relations for unrest and strikes.
 
 
 33
 Further, I believe the majority misapprehends the effect of Section 502 on the court's ability to compel arbitration under a contract. The Supreme Court in Local 174 Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), held that there is an obligation not to strike coterminous with the contract's arbitration clause even in the absence of a specific no-strike clause. The majority would now seem to read that decision to say that if a court cannot enjoin a strike, it cannot compel arbitration of the issue in spite of a broad arbitration agreement. I believe that such reasoning is unwarranted and undercuts the salutary principle of United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), which permits federal courts to order disputes covered by an appropriate provision to an arbitrator. Section 502 nowhere states or implies that safety issues are not appropriate for an arbitrator's decision. In fact, as I view it, the section requires a third party, a court, to determine the reasonableness of the union's belief in the abnormally dangerous condition. Since Congress has determined by its enactment of Section 502 that a court may appropriately decide a safety claim, absent language to the contrary, there is no reason to believe that an impartial arbitrator is not equally capable of rendering a similar decision.
 
 
 34
 It seems perfectly reasonable and logical that even if a court cannot order employees to return to work because of Section 502, it can still order the matter to arbitration if the contract so states. Such a result would properly harmonize the federal policies in favor of both worker protection and peaceful settlement of labor disputes.
 
 
 35
 Were it not for the majority's conclusion on this point, I believe the contract would compel the union to submit the safety question to arbitration. The National Bituminous Coal Wage Agreement of 1968 contains a broad arbitration clause providing for final and binding arbitration, including as well ". . . differences . . . about matters not specifically mentioned in [said] agreement . . ." and ". . . any local trouble of any kind [arising] at the mine. . . ." This dispute fell squarely within the language of this arbitration clause and was not excluded from arbitration by any other provision of the agreement. See, e.g., Blue Diamond Coal Co. v. United Mine Workers, 436 F.2d 551 (6th Cir. 1970).
 
 
 36
 Finally, it is important to point out that the preliminary injunction avoided the Section 502 issue by specifically providing for the continued safety of the men in the mine. It forbade the foremen from returning to their jobs pending the resolution of the dispute. This protection was all the union could properly demand in light of the appropriate arbitration order.
 
 
 37
 Vacating the preliminary injunction solves nothing. It restores the parties to the impasse which confronted them in June 1971. I would affirm the order of the district court.
 
 
 
 [1]
 This conclusion makes it unnecessary to discuss Boys Markets, Inc. v. Retail Clerk's Union, 1970, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, upon which appellee places great reliance. For that decision is grounded upon a finding that an economic dispute, not involving safety, was subject to compulsory arbitration under the employees' labor contract
 It is also unecessary to decide whether, in the unlikely case of a contract specifically declaring that safety disputes are subject to compulsory arbitration, a work stoppage over a safety dispute would be enjoinable.
 
 
 [1]
 The same letter to the union president concluded with the following statement:
 "The objectives of the mining laws of this State is [sic] to enhance and assure mine safety. The penalty language in the Bituminous Mining Law was meant to penalize violators of the mining law to the extent deemed appropriate by the judiciary. Other than the above noted action on the part of our District Inspector and the penalty imposed by the magistrate, we feel that sufficient action has been taken by the Commonwealth in this case."